# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **BRIAN PARKER, MICHAEL FRANK, MARK DAILEY,** and **JEREMY COZART,** on behalf of themselves and all others similarly situated,<br><br> *Plaintiffs*,<br><br>v.<br><br>**ABC DEBT RELIEF, LTD. CO., THE DEBT ANSWER, LLC, LLOYD WARD, P.C. D/B/A LLOYD WARD & ASSOCIATES, LLOYD REGNER,** and **LLOYD WARD,**<br><br> *Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Civil Action No. 3:10-CV-1332-P** |

---

## PLAINTIFFS' MOTION TO STRIKE DEFENDANTS' AFFIDAVIT SUBMITTED IN SUPPORT OF THEIR REPLY OR IN THE ALTERNATIVE MOTION FOR LEAVE TO FILE A SURREPLY

---

Dated:  January 9, 2012

Charles W. Branham, III
Texas Bar No. 24012323
tbranham@goldfarbbranham.com
**Jeffrey Goldfarb**
Texas Bar No. 00793820
jgoldfarb@goldfarbbranham.com
**Todd B. Goldberg**
Texas Bar No. 24072121
tgoldberg@goldfarbbranham.com

**GOLDFARB BRANHAM LLP**
Saint Ann Court
2501 N. Harwood Street, Suite 1801
Dallas, Texas 75201
214.583.2233 (Telephone)
214.583.2234 (Facsimile)

*Attorneys for Plaintiffs*

---

## INTRODUCTION AND FACTUAL DISCUSSION

Defendants ABC Debt Relief, Ltd. Co. ("ABC"), the Debt Answer, LLC ("Debt Answer"), and Lloyd Regner ("Regner"), (collectively, the "Defendants") filed, for the first time, an affidavit of Melanie Bixler, the alleged "Human Resources Director" for ABC Debt Relief, to support the proposition that they were unable to, over the course of eighteen (18) months to secure payroll records from ADP, one of the largest payroll services in the nation until November 11, 2011 (Doc.160).

A.   *Ms. Bixler is not the Human Resources Director*

Despite affirming that she is the "Human Resources Director of ABC Debt Relief, Ltd. Co.," Ricky Longo, the Chief Financial Officer and the Chief Operating Officer of ABC (and the Debt Answer) swore under oath that Ms. Bixler "no longer worked for the company" as of at least July 6, 2011. *See* Deposition of Rickey Longo, July 6, 2011 at page 31, line 9-12 (App. 11). Thus it is difficult to understand how Ms. Bixler could testify via affidavit regarding (1) her current roles as the "Human Resources Director" and (2) her "diligent efforts to secure records from ADP."

B.   *Newly disclosed destruction of evidence*.

Ms. Bixler's affidavit further reveals that these Defendants have known, for at least months, that evidence in this case was destroyed.   Ms. Bixler states that ADP "destroyed a number of records." *See* Bixler Aff. at 4.[1] Yet these Defendants never informed the Plaintifs of the same.   In fact, on October 3, 2011, Defendants responded to Plaintiffs' Requests for Production regarding destruction of evidence by stating that:

---

[1] This affirmative statement offered by the Defendants is conclusive proof that these Defendants have not maintained proper records of the time worked by their employees.

**REQUEST FOR PRODUCTION NO. 1**: All documents created, sent, received, or exchanged by or between any of the Defendants (including, without limitation, Lloyd Ward, Lloyd Regner, Kevin Devoto, and Rick Longo) discussing, mentioning, or concerning the preservation, destruction, or non-destruction of correspondence, e-mails, timesheets, Defendants' websites, screenshots of Defendants' websites, and any other documents that relate to Plaintiffs' claims or Defendants' defenses in this lawsuit. This request is limited to the time period beginning on July 1, 2010 through the present.

**RESPONSE**: After a diligent search, Defendants can find no responsive documents in their custody or control aside from those already produced in this lawsuit.

*See* Defendants Response to Plaintiffs Third Request for Production at 1-2 (App. 1-2). Apparently, this response is false.   Plaintiffs reserve the right to request spoliation sanctions as a result of this revelation.

    C.    *Ms. Bixler's Affidavit directly contradicts the testimony of Lloyd Ward*

    Ms. Bixler testifies in her affidavit that "ADP destroyed a number of records and was very difficult to deal with."  Bixler Aff. at 4.   Mr. Ward testified on July 6, 2011 that

> We would just request [copies of the paychecks] from ADP and they would give us a printout. Actually they would send you a CD.  And they may have been paid through ABC.  I think it was Lloyd Ward, but it may have been ABC.

Deposition of Lloyd Ward, July 6, 2011 at 27 (App. 25).   Thus, after Ms. Bixler ceased to be working with ABC, Mr. Ward, then counsel for all of the defendants testified that getting documents from ABC was a simple process of asking and receiving.

    D.    *Defendants undertook no formal discovery to secure documents from ADP*.

    Assuming *arguendo* that ADP was actually being "difficult," the Federal Rules of Civil Procedure provide for formal methods of securing discovery from a third party.   In the more than eighteen months that this case has been pending, none of these defendants sent any third party discovery requests to ADP (or any other third party).   This lack of third party discovery

practice demonstrates the inescapable fact that these Defendants have actually exercised no diligence.

## LAW AND ARGUMENT

The Court should strike this affidavit because it is (1) demonstrably unreliable, (2) not supported by the evidence and (3) attempts to introduce new evidence and arguments in the reply brief.  In the alternative, the Court should grant the Plaintiffs leave to file a sur-reply.   Whether or not a court considers arguments and evidence raised for the first time in a reply brief is a matter of discretion for the court.  *Weber v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 455 F.Supp.2d 545, 551 (N.D.Tex. 2006) (Fitzwater, J.).   However, if the district court relies on arguments and evidence presented for the first time in a reply brief, the district court should give the non-movant an adequate opportunity to respond.  *Vaise Arms, Inc. v. Vais*, 383 F.3d 287, 292 (5th Cir. 2004)(citing *Seay v. Tenn Valley Auth.*, 339 F.3d 454, 481-482 (6th Cir. 2003).

Here, Defendants have introduced new evidence in a reply brief.   Plaintiffs request that this Court strike the affidavit of Melanie Bixler.   In the alternative, Plaintiffs request that this Court grant Plaintiffs leave to file a surreply.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that this Court stem the tide of filings in what is, at the end of the day, a routine FLSA case involving the failure to pay overtime and strike the latest litigation created filing by these Defendants and which is directly contradicted by the evidence created at or near the time of the acts on which this case is based occurred and the sworn testimony of the Defendants.   In the alternative, Plaintiffs request that the Court grant Plaintiffs leave to file a sur-reply.

Dated:  January 9, 2012                    Respectfully submitted,


                                            By:  */s/ Charles W. Branham, III*
                                            **Charles W. Branham, III**
                                            Texas Bar No. 24012323
                                            tbranham@goldfarbbranham.com
                                            **Jeffrey Goldfarb**
                                            Texas Bar No. 00793820
                                            jgoldfarb@goldfarbbranham.com
                                            **Todd B. Goldberg**
                                            Texas Bar No. 24072121
                                            tgoldberg@goldfarbbranham.com

                                            **GOLDFARB BRANHAM LLP**
                                            Saint Ann Court
                                            2501 N. Harwood Street, Suite 1801
                                            Dallas, Texas 75201
                                            214.583.2233 (Telephone)
                                            214.583.2234 (Facsimile)

                                            ***Attorneys for Plaintiffs***


## CERTIFICATE OF SERVICE

On January 9, 2012, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the CM/ECF system which will send a notice of electronic filing to all counsel of record. I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).


                                            */s/ Charles W. Branham, III*
                                            Charles W. Branham, III


## CERTIFICATE OF CONFERENCE

I hereby certify that I conferred with Dennis Holmgren, counsel for these Defendants pursuant to Local Rule 7.1.  Mr. Holmgren Confirmed that these Defendants are opposed to the above motion.  Therefore, Plaintiffs submit this motion to the Court for decision.


                                            /s/*Charles W. Branham, III*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **BRIAN PARKER, MICHAEL FRANK, MARK DAILEY, and JEREMY COZART,** on behalf of themselves and all others similarly situated, | § § § § § | |
| *Plaintiffs,* | § § | **Civil Action No. 3:10-CV-1332-P** |
| **v.** | § § | |
| **ABC DEBT RELIEF, LTD. CO., THE DEBT ANSWER, LLC, LLOYD WARD, P.C. D/B/A LLOYD WARD & ASSOCIATES, LLOYD REGNER, and LLOYD WARD,** | § § § § § § § | |
| *Defendants.* | § § | |

---

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION TO STRIKE DEFENDANTS'
AFFIDAVIT SUBMITTED IN SUPPORT OF THEIR REPLY OR IN THE
ALTERNATIVE MOTION FOR LEAVE TO FILE A SURREPLY**

---

Dated:  January 9, 2012

Charles W. Branham, III
Texas Bar No. 24012323
tbranham@goldfarbbranham.com
**Jeffrey Goldfarb**
Texas Bar No. 00793820
jgoldfarb@goldfarbbranham.com
**Todd B. Goldberg**
Texas Bar No. 24072121
tgoldberg@goldfarbbranham.com

**GOLDFARB BRANHAM LLP**
Saint Ann Court
2501 N. Harwood Street, Suite 1801
Dallas, Texas 75201
214.583.2233 (Telephone)
214.583.2234 (Facsimile)

*Attorneys for Plaintiffs*

# INDEX

| Description | App. |
|---|---|
| Defendants' Response to Plaintiffs' Third Request for Production | 1-3 |
| Ricky Longo- July 6, 2011 Deposition | 4-18 |
| Lloyd Ward- July 6, 2011 Deposition | 19-38 |

Dated:  January 9, 2012                    Respectfully submitted,


By:  */s/ Charles W. Branham, III*
                 **Charles W. Branham, III**
                 Texas Bar No. 24012323
                 tbranham@goldfarbbranham.com
                 **Jeffrey Goldfarb**
                 Texas Bar No. 00793820
                 jgoldfarb@goldfarbbranham.com
                 **Todd B. Goldberg**
                 Texas Bar No. 24072121
                 tgoldberg@goldfarbbranham.com

                 **GOLDFARB BRANHAM LLP**
                 Saint Ann Court
                 2501 N. Harwood Street, Suite 1801
                 Dallas, Texas 75201
                 214.583.2233 (Telephone)
                 214.583.2234 (Facsimile)

                 ***Attorneys for Plaintiffs***


## CERTIFICATE OF SERVICE

On January 9, 2012, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the CM/ECF system which will send a notice of electronic filing to all counsel of record. I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

                 */s/ Charles W. Branham, III*
                 Charles W. Branham, III

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

BRIAN PARKER, MICHAEL FRANK,        §
And MARK DAILEY, on behalf of        §
Themselves and other similarly-situated,   §
                                     §
           Plaintiffs                §
                                     §
v.                                   §
                                     §     CIVIL ACTION NO. 3-10CV1332-P
ABC DEBT RELIEF, LTD., CO., THE      §
DEBT ANSWER, LLC, LLOYD WARD, P.C.   §
D/B/A LLOYD WARD & ASSOCIATES,       §
LLOYD REGNER and LLOYD WARD          §
                                     §
           Defendants

---

## DEFENDANTS' RESPONSES
## TO PLAINTIFFS' THIRD REQUEST FOR PRODUCTION

---

**To:**  **Plaintiffs, Brian Parker, Michael Frank, and Mark Dailey by and through their attorneys of record, Goldfarb Branham, LLP, Charles W. Branham, III, 2501 N. Harwood Street, Suite 1801, Dallas, Texas 75201**

COME NOW Defendants ABC Debt Relief, Ltd., Co., The Debt Answer, LLC, Lloyd Ward

P.C. d/b/a Lloyd Ward & Associates, Lloyd Regner, and Lloyd Ward, (collectively "Defendants")

and serve these Defendants' Responses to Plaintiffs' Third Request for Production.

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1**: All documents created, sent, received, or exchanged by or between any of the Defendants (including, without limitation, Lloyd Ward, Lloyd Regner, Kevin Devoto, and Rick Longo) discussing, mentioning, or concerning the preservation, destruction, or non-destruction of correspondence, e-mails, timesheets, Defendants' websites, screenshots of Defendants' websites, and any other documents that relate to Plaintiffs' claims or Defendants' defenses in this lawsuit. This request is limited to the time period beginning on July 1, 2010 through the present.

**RESPONSE**:  After a diligent search, Defendants can find no responsive documents in their

---

custody or control aside from those already produced in this lawsuit.

**REQUEST FOR PRODUCTION NO. 2**: All documents created, sent, received, or exchanged by or between any of the Defendants (including, without limitation, Lloyd Ward, Lloyd Regner, Kevin Devoto, and Rick Longo) discussing, mentioning, or reflecting any document retention, non-destruction, or litigation hold policies put into place by any of the Defendants or communicated by the Defendants to any of their employees that relate to Plaintiffs' claims or Defendants' defenses in this lawsuit, including, without limitation, any litigation hold memorandum, legal holds policy, or other notices regarding the preservation, destruction, or non-destruction of documents. This request is limited to the time period beginning on July 1, 2010 through the present.

**RESPONSE**: After a diligent search, Defendants can find no responsive documents in their custody or control aside from those already produced in this lawsuit.

Respectfully Submitted,

_____
Bar Card #20845100
Lloyd Ward & Associates, P.C.
12655 LBJ Freeway, Ste. 1000
Dallas, Texas  75243
Telephone (972) 361-0036
Facsimile (972) 361-0039

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of _October_, 2011 a true and correct copy of the above and foregoing has been sent to the following counsel of record via hand delivery:

Goldfarb Branham, LLP
Charles W. Branham, III
2501 N. Harwood St., Suite 1801
Dallas, Texas 75201
ATTORNEYS FOR PLAINTIFFS
**VIA CMRRR: 7010 0780 0000 5394 8057
& FACSIMILE: 214-583-2234**

Lloyd Ward

RICKY LONGO
July 6, 2011

1

1        UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF TEXAS
2            DALLAS DIVISION
3    G. CHRIS ONORATO,      *
                            *
4        Plaintiff,         *
                            *
5    VS.               *  CIVIL ACTION
                  *  NO. 3:10-CV-1791
6    ABC DEBT RELIEF, LTD. CO.,  *
     LLOYD REGNER AND KEVIN   *
7    DEVOTO, LLOYD WARD &      *
     ASSOCIATES AND LLOYD WARD,  *
8                            *
         Defendants.         *
9
10   ************************************************
11        ORAL DEPOSITION OF
12            RICKY LONGO
13            JULY 6, 2011
14   ************************************************
15
16        ANSWERS AND ORAL DEPOSITION OF RICKY LONGO
17   produced as a witness at the instance of the Plaintiff,
18   and duly sworn, was taken in the above-styled and
19   numbered cause on the 6th day of July, 2011 from 12:38
20   p.m. to 2:10 p.m., before Deborah Marks, CSR in and for
21   the State of Texas, reported stenographically, at the
22   offices of Lloyd Ward & Associates, 12655 LBJ Freeway,
23   Suite 1000, Dallas, Texas, pursuant to the Federal
24   Rules of Civil Procedure and the provisions stated on
25   the record.

2

1        A P P E A R A N C E S
2
3    FOR THE PLAINTIFF:
         Mr. Robert J. Wood, Jr.
4        FELL & WOOD, LLP
         3021 East Renner Road
5        Suite 140
         Richardson, Texas 75082
6        972.488.8177
7
     FOR THE DEFENDANTS:
8        Mr. Lloyd Ward
         LLOYD WARD & ASSOCIATES
9        12655 LBJ Freeway
         Suite 1000
10       Dallas, Texas 75243
         972.361.0036
11
12   ALSO PRESENT:  Mr. G. Chris Onorato
13
14
15
16
17
18
19
20
21
22
23
24
25

3

1            I N D E X
2    WITNESS                    PAGE
     RICKY LONGO
3
     EXAMINATION
4    BY:  Mr. Wood............................4, 49
         Mr. Ward................................44
5
     Changes and Signature.............................58
6
     Reporter's Certificate.............................60
7
8            EXHIBITS
9    NUMBER        DESCRIPTION        IDENTIFIED
10   Exhibit 7    Employee Time Cards...................21
11   Exhibit 8    Compensation Report...................22
12   Exhibit 9    Chris Onorato Payroll Analysis.........22
13
14
15
16
17
18
19
20
21
22
23
24
25

4

1        P R O C E E D I N G S
2            RICKY LONGO,
3    having been duly sworn, testified as follows:
4            EXAMINATION
5    BY MR. WOOD:
6        Q.   Sir, would you state your name, please.
7        A.   Ricky Longo.
8        Q.   Sir, what's your residential address?
9        A.   7804 Rancho de la Osa Trail.  It's McKinney,
10   Texas 75070.
11       Q.   Are you employed by ABC Debt Relief?
12       A.   Yes.
13       Q.   Sometimes today I will refer to that as ABC.
14   Okay?
15       A.   Okay.
16       Q.   What is your title there?
17       A.   CFO and COO.
18       Q.   How long have you been employed at ABC?
19       A.   Since January of 2010.
20       Q.   Do you know Chris Onorato?
21       A.   Yes, I do.
22       Q.   Were you able to observe his performance as
23   an employee with ABC?
24       A.   To some degree.
25       Q.   Do you have an opinion about whether he was a

App. 4

**RICKY LONGO**
**July 6, 2011**

5

1  good employee?
2  **A. Yes.**
3  Q. Was he a good employee?
4  **A. He was.**
5  Q. Was he one -- what was his position there?
6  **A. Sales representative.**
7  Q. Is that -- was that his official title?
8  **A. I'm not sure.**
9  Q. Could it have been senior debt analyst?
10  **A. That could be.**
11  Q. Was that one of his titles there?
12  **A. That is one of his titles.**
13  Q. Was he one of the better debt senior
14  analysts?
15  **A. Well, there's 60 of them so...**
16  Q. How would you determine whether somebody was
17  a good senior debt analyst?
18  **A. Sales. Measure it by sales.**
19  Q. And by that measurement, was Mr. Onorato one
20  of the best senior debt analysts there?
21  **A. At one time, yes.**
22  Q. What time would that be?
23  **A. It was the middle of January through probably**
24  **beginning of April, maybe middle of April.**
25  Q. 2010?

6

1  **A. 2010.**
2  Q. Was he above average the rest of his
3  employment there?
4  **A. Sales volume-wise, no.**
5  Q. What do you attribute that to?
6  **A. I'm not sure.**
7  Q. Overall, was he one of the -- was he an above
8  average employee?
9  **A. Yes.**
10  Q. Is he still employed by ABC?
11  **A. No.**
12  Q. Why not?
13  **A. He was terminated. His employment was**
14  **terminated, I believe, in September or October of 2010.**
15  Q. Who made the decision to terminate him?
16  **A. I'm not sure who made the final decision.**
17  Q. Did you make it?
18  **A. No, I didn't make it.**
19  Q. Did someone -- how did you learn of
20  Mr. Onorato being terminated?
21  **A. By conference call.**
22  Q. Who was on the conference call?
23  **A. That would have been Lloyd Regner, Kevin**
24  **Devoto and I believe --**
25      THE WITNESS: Lloyd, you were the on the

7

1  phone call, too?
2  Q. (By Mr. Wood) You can't ask him. He can't
3  help you. You have to just give us your best
4  recollection.
5  **A. That's who was on the original conference**
6  **call.**
7  Q. So the conference call was Lloyd Regner,
8  Kevin Devoto, Lloyd Ward and Rick Longo?
9  **A. Yes.**
10  Q. When did that conference call take place?
11  **A. I believe sometime in September. I don't**
12  **know the exact date.**
13  Q. September 2010?
14  **A. Yes.**
15  Q. And was the decision made in that conference
16  call to terminate Mr. Onorato?
17  **A. Yes.**
18  Q. And what was the reason given for it?
19  **A. The production that we were paying him had**
20  **run out and we saw no way that he'd be able to come**
21  **back and fit into the workforce and sell.**
22  Q. Why couldn't he come back and fit in?
23  **A. Basically because of the allegations in the**
24  **lawsuit, it would have been very difficult for him to**
25  **perform.**

8

1  Q. Which lawsuit -- which allegations?
2  **A. Of time and sexual harassment and things that**
3  **were clear that we didn't believe were.**
4  Q. I'm sorry. You didn't believe were?
5  **A. Existed.**
6  Q. You thought his allegations were untrue?
7  **A. Yes.**
8  Q. But the fact that he made the allegations
9  meant that he couldn't come back?
10  **A. I'm not sure if that's exactly true, but we**
11  **didn't see an ability for him to perform if he did come**
12  **back.**
13  Q. Well, are you saying he couldn't take phone
14  calls anymore?
15  **A. Our decision was to not go down that road.**
16  Q. Okay. Well, I mean, his job consisted of
17  taking phone calls and talking to potential clients,
18  right?
19  **A. Right.**
20  Q. You assume he could still do that, right?
21  **A. He wasn't performing when he left.**
22  Q. He wasn't performing when he left. What does
23  that mean?
24  **A. His sales were way down.**
25  Q. Okay. But he was still above average, right?

**RICKY LONGO**
**July 6, 2011**

3 (Pages 9 to 12)

9

1      A.  Not at the time that he left, no.
2      Q.  Well, when you say his sales were down, over
3  what period of time were they down?
4      A.  For a few months.
5      Q.  For several months?
6      A.  Yes.
7      Q.  All right.  What documents could we look at
8  to prove that?
9      A.  We have weekly production reports, I believe,
10  that can show production by sales rep.
11      Q.  Who else was terminated in 2010 for poor
12  performance?
13      A.  Oh, my God.  I can't even name all of them.
14      Q.  Well, were there any?
15      A.  Yes.
16      Q.  Which senior debt analysts were terminated in
17  2010 for poor performance?
18      A.  Many.
19      Q.  You can't name one?
20      A.  I'd have to look at the list.  There were so
21  many, I don't...
22      Q.  All right.  Getting back to my question,
23  though, you believed that Mr. Onorato today has the
24  ability to take phone calls and deal with customers,
25  right?

10

1      A.  I don't know that.
2      Q.  All right.  Well, he is sitting here right
3  next to me.  He doesn't seem like he's paralyzed.  He
4  seems like he is okay, doesn't he?
5      A.  He seems fine.
6      Q.  All right.  Do you assume that he is able to
7  take phone calls and talk with potential clients today?
8      A.  Do I assume?  I don't assume anything.
9      Q.  All right.  You don't know one way or the
10  other?
11      A.  Exactly.
12      Q.  Okay.  When was Mr. Onorato told that he had
13  been terminated?
14      A.  I don't know exactly when.  It was in the
15  fall.
16      Q.  But you believe it happened?
17      A.  Yes.
18      Q.  Did you communicate that to him?
19      A.  I believe it was our HR department.
20      Q.  Do you know how it was communicated to him?
21      A.  I'd have to look into it.  I'd have to check
22  and see.
23      Q.  Did everybody on the conference call meaning
24  Mr. Regner, Mr. Devoto, Mr. Ward and yourself, did
25  everyone concur on the termination decision?

11

1      A.  Yes.
2      Q.  I'm going to show you what was marked as
3  Exhibit 4 in Mr. Ward's deposition.
4          MR. WOOD:  Is it all right if we just
5  use the same exhibits?
6          MR. WARD:  If you don't mind, even
7  through tomorrow, if we can use one exhibit notebook?
8          MR. WOOD:  Yes.
9      Q.  (By Mr. Wood) Is Exhibit 4 an e-mail that you
10  sent to Mr. Onorato?
11      A.  Yes.
12      Q.  It was an e-mail that you sent to
13  Mr. Onorato, true?
14      A.  Yes.
15      Q.  Did Mr. Ward give you that direction?
16          MR. WARD:  Now I'm going to object.  To
17  the extent it calls for attorney/client privilege, I'm
18  going to instruct you not to answer.  If you can,
19  answer without going into what we discussed.
20          MR. WOOD:  Well, I'm going to object to
21  the objection because you testified in your deposition
22  that the attorney/client relationship started with
23  respect to Mr. Onorato when he filed suit.  And this is
24  before suit was filed.
25          MR. WARD:  That's okay.  But I'm going

12

1  to go ahead -- to the extent that we discussed this, as
2  the attorney I'm going to instruct you not to answer.
3  If you can answer it without disclosing what our
4  communications would have been, then you can answer.
5  Go ahead.
6          MR. WOOD:  I don't understand your
7  instructions.  You're saying he can answer it if he --
8  if it's not an attorney/client...
9          MR. WARD:  If it's not something we
10  directly discussed.  If it's not something I told him,
11  then he can answer it.  But if it's something I told
12  him in regard to this issue, then the answer is don't
13  tell.
14      Q.  (By Mr. Wood) I don't understand that.  I
15  doubt you understand that, but go ahead.
16      A.  I kind of understand that.
17      Q.  Well, let me -- before you answer that, let
18  me ask you this.  Is it your belief that every time you
19  had a discussion with Mr. Ward back then, that it was
20  an attorney/client privileged conversation?
21      A.  Yes.
22      Q.  So every -- so if Mr. Ward picked up the
23  phone and said, Rick, we're not happy with the number
24  of potential clients that ABC is getting for us; you
25  guys need to do better down there, is that an

**RICKY LONGO**
**July 6, 2011**

13

1   attorney/client privileged communication in your mind?
2       **A.   No, that wouldn't be.**
3       Q.   Okay.  And if Mr. Ward calls and says, Rick,
4   we've been getting some complaints from some of our
5   customers about one of your debt analysts down there.
6   They say he's rude; they say he's not helpful; I'm not
7   really sure he should be doing our work anymore, is
8   that an attorney/client privileged communication?
9       **A.   That could be.  I would -- if it's going to**
10  **affect our employee and any action against them, yes, I**
11  **would think that would be.**
12      Q.   Okay.  So you're not going to tell me --
13  you're not going to tell me about the conversations
14  between you and Mr. Ward which resulted in you sending
15  Exhibit Number 4?
16      **A.   No.**
17      Q.   All right.  You contend that was an
18  attorney/client privileged communication?
19      **A.   Yes.**
20      Q.   Okay.  And just to keep me from having to ask
21  you all the questions, so if I asked you about any
22  communication you had with Mr. Ward about Exhibit 4 or
23  about any of the things that led up to Exhibit 4 being
24  said, you wouldn't answer the question because of
25  attorney/client privilege?

14

1       **A.   Correct.**
2       Q.   All right.  You never had the authority to
3   fire Mr. Ward's law firm, did you?
4       **A.   No.**
5       Q.   And you are not the one that hired him
6   either, are you?
7       **A.   No.**
8       Q.   What is your understanding of what the
9   relationship is between ABC and Lloyd Ward &
10  Associates?  What was it back in 2010?
11      **A.   More specifically?**
12      Q.   What was the relationship in 2010 between ABC
13  Debt Relief and Lloyd Ward & Associates?
14      **A.   ABC Debt Relief, we were hired to administer**
15  **the program, the debt relief program.**
16      Q.   What does that mean?
17      **A.   That means they were contracted to maintain**
18  **the employees, maintain the employees' payroll, handle**
19  **all the advertising, handle all the management out of**
20  **the back room, which the back room would be client**
21  **services for part of the business.**
22      Q.   What, in 2010 -- like I say, in the summer of
23  2010, roughly how many employees did ABC have?
24      MR. WARD:  For purposes of
25  clarification, do you mean --

15

1       MR. WOOD:  I mean --
2       MR. WARD:  Wait.  For purposes of
3   clarification when you say that you mean ABC or Lloyd
4   Ward & Associates, the employee leasing agreements?
5       MR. WOOD:  I think you're making a
6   speaking objection, Counsel.  I wish you would let him
7   answer the question.
8       Q.   (By Mr. Wood) Sir, the question to you is, In
9   the summer of 2010, how many employees roughly did ABC
10  have?
11      **A.   Under management or...**
12      Q.   How many employees, total, roughly did ABC
13  have in the summer of 2010?
14      **A.   I'm not exactly sure.**
15      Q.   Just give me a ballpark.  Was it 50?  Was it
16  500?
17      **A.   Forty-five.**
18      Q.   I'm sorry?
19      **A.   Maybe 45.**
20      Q.   I want to go through the different types of
21  employees that ABC had.  What were the different types
22  of employees?
23      **A.   There was client services that we managed for**
24  **Lloyd Ward.**
25      Q.   Okay.  Who else?

16

1       **A.   There was client services we managed for ABC**
2   **Debt Relief, which is the original company.**
3       Q.   All right.  Anyone else?
4       **A.   There were employees for the sales force for**
5   **Lloyd Ward.**
6       Q.   All right.
7       **A.   And I believe that's it.**
8       Q.   And ABC was located on the 8th floor of this
9   building, right?
10      **A.   Yes.**
11      Q.   And all of the people in that space were
12  employees of ABC?
13      **A.   They were contracted to -- they were**
14  **contracted out, but they were paid by ABC payroll**
15  **system.**
16      Q.   Everybody was paid by ABC?
17      **A.   Yes.**
18      Q.   And you said the first type of employees were
19  client services employees managed for Lloyd Ward,
20  right?
21      **A.   Yes.**
22      Q.   What does that mean?
23      **A.   That means they specifically were taking care**
24  **of clients under Lloyd Ward's platform, the business**
25  **platform.**

**RICKY LONGO**
**July 6, 2011**

17

1    Q.  What did the ones that are client services
2  for ABC Debt Relief do?
3      **A.  Similar type client services, but for**
4  **accounts that Mr. Ward had nothing to do with.**
5      Q.  Well, who did they have something to do with
6  them?
7      **A.  The owners of ABC.**
8      Q.  What was the third type of employee?  Sales
9  force, Lloyd Ward?
10     **A.  Sales force, Lloyd Ward, yes.**
11     Q.  What was that?
12     **A.  That was the sales reps that Khris did,**
13  **managed and marketed for that.**
14     Q.  What were Mr. Onorato's job duties?
15     **A.  Specifically, I wasn't the direct sales**
16  **manager.  I can't tell you what the duties were.**
17     Q.  You don't have any idea?
18     **A.  He was a sales rep, represented sales of the**
19  **product.  But as far as specifically how he did it, I**
20  **just -- that was not anything I managed directly.**
21     Q.  Did he take telephone calls?
22     **A.  Yes.**
23     Q.  Did he talk with people to see if they
24  could -- if they were candidates for debt settlement?
25     **A.  Yes.**

18

1    Q.  Were there guidelines that he used to
2  determine whether they were candidates?
3      **A.  I believe there were guidelines, yes.**
4      Q.  Okay.  Could he deviate from the guidelines?
5      **A.  No.**
6      Q.  Once he determined somebody was a good
7  candidate for debt settlement, then what happened to
8  it?  What was the next step in the program?
9      **A.  The next step in the program was to actually**
10  **execute their agreements, customer service agreements.**
11     Q.  Who did that?
12     **A.  The sales reps, they did that.**
13     Q.  Mr. Onorato?
14     **A.  Mr. Onorato, yes.**
15     Q.  Then what was the next step in the program?
16     **A.  The next step in the program was a welcome or**
17  **quality assurance call from our back office.**
18     Q.  And who employed those employees, the quality
19  assurance employees?
20     **A.  Those were leased employees to Lloyd Ward**
21  **that we managed.**
22     Q.  Leased to Lloyd Ward?
23     **A.  Yes.**
24     Q.  ABC employees that were leased to Lloyd Ward?
25     **A.  Yes.**

19

1    Q.  ABC paid them?
2    **A.  Yes.**
3    Q.  ABC paid them -- was reimbursed by Mr. Ward?
4    **A.  Yes.**
5    Q.  What was the next step in the program?
6    **A.  After that, it was just ongoing debt**
7  **settlement, the actual negotiation with the creditors**
8  **and things that unless they're under contract they're**
9  **managed from anywhere from two and a half to four or**
10  **five years, depending on how long they were signed up**
11  **to help negotiate their debt.**
12     Q.  Mr. Ward said earlier the debt was negotiated
13  by his law firm.  Is that right?
14     **A.  Yes.**
15     Q.  So the debt was negotiated by his law firm
16  rather than ABC?
17     **A.  Yes.**
18     Q.  And payments were made by the clients to --
19     **A.  To Mr. Ward.**
20     Q.  -- to his law firm?
21     **A.  Yes, to an account that he has.**
22     Q.  Was ABC paid by Mr. Ward's law firm for its
23  services?
24     **A.  Yes.**
25     Q.  And that's how ABC made its money?

20

1    **A.  Yes.**
2    Q.  Is it fair to say that ABC was a sales and
3  marketing company for Lloyd Ward & Associates?
4    **A.  Yes.**
5    Q.  So the real -- if you were asked who are the
6  clients of ABC, the clients of ABC would be Lloyd Ward
7  & Associates and the other law firms that ABC worked
8  with?
9    **A.  Yes.**
10     Q.  Do you know how many hours per week
11  Mr. Onorato worked?
12     **A.  Not specifically.**
13     Q.  Do you have any idea at all?
14     **A.  Our sales reps, depending -- we had some --**
15  **our payroll system had the ability to -- for them to**
16  **log in, but not many of them were super accurate about**
17  **that.  They were asked to work 40, but in a lot of**
18  **cases they worked more.**
19     Q.  You just don't know how many Mr. Onorato --
20     **A.  I don't know exactly.**
21     Q.  Or even a ballpark?
22     **A.  No.**
23     Q.  And there aren't any records that would
24  reflect that?
25     **A.  There's time sheets, but I don't think that**

**RICKY LONGO**
**July 6, 2011**

21

1 they're consistent enough because the reps didn't fill
2 them enough to be exact. So it took -- tried to keep
3 track the best we could.
4          (Exhibit 7 marked)
5      Q. (By Mr. Wood) Let me show you what I've marked
6 as Exhibit 7, and ask you if you recognize that
7 document.
8      A. Yes.
9      Q. Do you know how that document was -- well,
10 what is that document?
11      A. That's the time cards of our Paychex payroll
12 system. We have a time and labor system that we
13 asked -- some point in time -- I don't think it was
14 from the very beginning -- but asked them to fill in to
15 track the time they were in and out of the office.
16      Q. And how would the numbers that were on that
17 system be input into it?
18      A. That would be by the sales reps themselves,
19 entering the times they get in to entering the times
20 they leave.
21      Q. But you don't think it's accurate because the
22 sales reps didn't use it as much as they should?
23      A. Exactly.
24      Q. And the company knew that they didn't?
25      A. Yes. We tried to get them to be accurate

22

1 but...
2      Q. When did the company start using that system?
3      A. I can't remember exactly. Early 2010.
4      Q. Did it use that same system all throughout
5 Mr. Onorato's employment?
6      A. Once it was started, yes, until...
7      Q. Can you tell me --
8          (Exhibit 8 marked)
9      Q. (By Mr. Wood) I'm showing you what I've marked
10 as Exhibit 8. Can you tell me what Exhibit 8 is?
11      A. It's a Paychex compensation report, just what
12 went through the payroll system.
13      Q. What's the difference between Exhibit 7 and
14 Exhibit 8?
15      A. Exhibit 7 is just like a time clock.
16 Exhibit 8 is actual checks that were processed through
17 the payroll system.
18      Q. And Mr. Onorato was paid on a commission only
19 basis?
20      A. Correct.
21      Q. And so what the checks reflect are
22 commissions that were paid to him?
23      A. Commissions and/or bonus, yes.
24          (Exhibit 9 marked)
25      Q. (By Mr. Wood) I'm going to show you what's

23

1 marked as Exhibit 9, and ask you if you can tell me
2 what that document is.
3      A. Just an assumption of hours.
4      Q. Did you prepare that document?
5      A. Yes, I did.
6      Q. Why did you prepare that document?
7      A. Upon request.
8      Q. Who requested it?
9      A. Mr. Ward.
10      Q. Did he say why he wanted it?
11          MR. WARD: Objection. Instruct you not
12 to answer.
13      Q. (By Mr. Wood) When did you prepare that
14 document?
15      A. I would say probably early summer.
16      Q. Did you try to do an accurate job when you
17 prepared it?
18      A. Tried to do an accurate job?
19      Q. Let me ask it this way. Were you trying to
20 convey accurate information?
21      A. Yes.
22      Q. You were trying to convey what Mr. Onorato
23 would be owed in overtime if he were owed overtime?
24      A. I don't remember exactly why we did it. Just
25 did it.

24

1      Q. May I see it back for just a second? How did
2 you come up with 11 hours per day?
3      A. Actually, off the top of my head, I'm sure.
4      Q. I'm sorry?
5      A. Off the top of my head. I just threw it out
6 there.
7      Q. You just threw 11 out there?
8      A. Uh-huh.
9      Q. How did you choose 11 as opposed to 8 or 14?
10      A. I don't know.
11      Q. You don't know?
12      A. No. I don't remember.
13      Q. You must have had some reason for doing it,
14 right?
15      A. Just to get an idea.
16      Q. An idea of what?
17      A. Idea of what we should pay him.
18      Q. Did you believe that he worked 11 hours per
19 day?
20      A. I don't know that for sure.
21      Q. Did you believe it at the time?
22      A. I really don't know.
23      Q. Let me show you what was previously marked as
24 Exhibit 6. This is an e-mail that you received that
25 was sent by Mr. Ward on July 7, 2010. You did receive

**RICKY LONGO**
**July 6, 2011**

25

1  that, right?
2  **A. Yes.**
3  Q. Did you believe that the e-mail was accurate
4  when you read it?
5  **A. I don't recall making that assumption, but...**
6  Q. Well, when it says in the middle of the first
7  paragraph that his -- that the calculations were based
8  on a 77-hour workweek, did you assume that he worked 77
9  hours per week?
10  **A. Not necessarily, no.**
11  Q. Did you ever -- when you saw that, did you
12  correct anyone and say, Hey, he didn't work 77 hours
13  per one week?
14  **A. I didn't address it.**
15  Q. You did your calculation, which is Exhibit
16  Number 9, after you got this e-mail or before?
17  **A. I don't recall.**
18  Q. So you don't know whether Mr. Onorato worked
19  40 hours per week or 8. You just have no knowledge of
20  it, correct?
21  **A. I don't.**
22  Q. Who would know besides Mr. Onorato in the
23  company? Who would know how many he worked?
24  **A. Sales manager would know, the best chance.**
25  Q. Who was that?

26

1  **A. Khris Devoto.**
2  Q. Rob McLain was suspended, correct?
3  **A. Correct.**
4  Q. For sending around an obscene photograph of
5  Mr. Onorato?
6  **A. Yes.**
7  Q. But he was allowed to come back to work?
8  **A. Yes.**
9  Q. Were you a part of any conference call
10  involving him where it was discussed whether he'd be
11  about to fit back in and do his job?
12  **A. A conference call?**
13  Q. Let me ask it a different way.
14      Are you aware of any discussion about
15  whether because of what Mr. McLain had done, he would
16  be able to fit back in and do his job?
17  **A. Yes.**
18  Q. Who was involved in that discussion?
19  **A. Kevin Devoto.**
20  Q. Anyone else?
21  **A. I don't recall. I think there was. I just**
22  **don't recall who was.**
23  Q. And what was the difference -- what was it
24  that made it possible for Mr. McLain to come back in
25  the organization but not Mr. Onorato?

27

1  **A. I really don't think -- I don't think we**
2  **correlated -- I think we correlated the two the same.**
3  Q. Well, no, they're not the same. One guy sent
4  an obscene e-mail about -- one guy sent an obscene
5  e-mail, Mr. McLain. The other guy didn't, Onorato,
6  right?
7  **A. I really don't know what they did to one**
8  **another.**
9  Q. You know McLain sent an obscene e-mail about
10  Onorato, correct?
11  **A. Yes.**
12  Q. You don't have any reason to believe that
13  Onorato did the same thing, do you?
14  **A. I don't know that, no.**
15  Q. All right. And there were discussions about
16  both men, about whether they could rejoin the
17  organization, right?
18  **A. No. They didn't happen at the same time at**
19  **all.**
20  Q. I didn't say it happened at the same time.
21  I'm saying there were discussions about both men about
22  whether they could rejoin the organization, right?
23  **A. Yes.**
24  Q. And the discussion about McLain resulted in
25  him rejoining the organization, right?

28

1  **A. Correct.**
2  Q. The discussion about Onorato resulted in him
3  not rejoining the organization, right?
4  **A. Correct.**
5  Q. Why was McLain allowed to rejoin the
6  organization and Onorato wasn't?
7  **A. I can't answer that.**
8  Q. Well, you were involved in the discussions.
9  What was the discussion about McLain that resulted in
10  him being allowed to rejoin the organization?
11  **A. Well, I wish I was in the last one. I was**
12  **not in the final discussion as far as the details of**
13  **what he was expected to do when he returned. That was**
14  **between the sales manager, human resources. They**
15  **talked to him and put him on a warning not to ever let**
16  **that happen again. I mean, I didn't directly have a**
17  **conversation. That's just the gist of what we did.**
18  Q. Who was the better performer between Onorato
19  and McLain?
20  **A. I guess it depends on the time frame. Our**
21  **reps were up and down --**
22  Q. The time frame is 2010. You judge guys on an
23  annual basis, right?
24  **A. Yes. I would say we judge them more on a**
25  **tighter schedule. More on monthly.**

**RICKY LONGO**
**July 6, 2011**

29

1    Q.  But you wouldn't fire somebody because of a
2  bad month, would you?
3    **A.  No.**
4    Q.  You would take a broader view and look at
5  their annual production?
6    **A.  I don't know if it would be annual.  There's**
7  **so many more things involved in that.**
8    Q.  But if someone had been one of your best
9  performers earlier in the year but then had a slump,
10  you wouldn't fire them for having a bad month or two,
11  would you?
12    **A.  No.**
13    Q.  So do you remember Mr. Onorato ever
14  complaining about what McLain had done to him?
15    **A.  Yes.  He came to my office to complain.**
16    Q.  And what did he tell you?
17    **A.  He e-mailed me the picture that he sent and**
18  **thought it was inappropriate, so he took action.**
19    Q.  Did McLain admit to doing it?
20    **A.  Yes.**
21    Q.  Was Mr. Onorato a team lead at the time?
22    **A.  I don't know the timing.  Possibly.**
23    Q.  He was a team lead at one point?
24    **A.  He was a team lead at one point.**
25    Q.  And then he was removed from that position?

30

1    **A.  Yes.**
2    Q.  Why did that happen?
3    **A.  He was removed from that position because he**
4  **was struggling production-wise.  So rather than have**
5  **any extra burden on him, we thought he'd be able to**
6  **pull his performance back up if he could concentration**
7  **on just his own.**
8    Q.  Who the made the decision to move him from
9  his position?
10    **A.  That would have been our sales manager, and**
11  **the owner, Kevin Devoto, because he basically is the**
12  **sales force behind the company.**
13    Q.  Did Devoto tell you why he made that
14  decision?
15    **A.  Yes.**
16    Q.  Was it because -- what was the reason?
17    **A.  To allow him to concentrate and get a chance**
18  **to get his product production back up.**
19    Q.  Did Onorato tell you that McLain had made any
20  inappropriate comments to a female employee?
21    **A.  Yes.**
22    Q.  What did he say McLain had said?
23    **A.  I don't recall exactly.**
24    Q.  Was it inappropriate, whatever it was?
25    **A.  I believe so.**

31

1    Q.  Did you confront McLain with it?
2    **A.  I did not, no.**
3    Q.  Do you know if anybody did?
4    **A.  Possibly our HR person did.**
5    Q.  Did you hear if the HR person had done so?
6    **A.  Pardon?**
7    Q.  Did you hear that the HR person had done so?
8    **A.  I believe so.**
9    Q.  What's the HR person's name?
10    **A.  Melanie Bixler.**
11    Q.  Is she still with company?
12    **A.  No.**
13    Q.  Are you aware that Mr. Onorato filed for
14  unemployment?
15    **A.  Yes.**
16    Q.  Are you aware that there was a hearing where
17  Ms. Bixler testified under oath pertaining to his claim
18  on the employment?
19    **A.  Yes.**
20    Q.  Was she authorized on behalf of the company
21  to be there that day?
22    **A.  Yes.**
23    Q.  Were you listening that day?
24    **A.  No.**
25    Q.  But she was authorized to speak for the

32

1  company?
2    **A.  Yes.**
3    Q.  And she had knowledge about Mr. Onorato's
4  situation enough to be able to speak for the company,
5  right?
6    **A.  I believe so.**
7    Q.  All right.  Were there any other discussions
8  about why Mr. Onorato was no longer employed by ABC
9  that you know about that you haven't told me about?
10    **A.  I don't know.**
11    Q.  Was it your belief that when he was put on
12  suspension, it was just temporary?
13    **A.  Yes.**
14    Q.  And that he would -- and that unless -- okay.
15  It was temporary.  What -- strike that.
16    What was the purpose of him being put on
17  suspension initially?
18    **A.  In order just to find out what all the other**
19  **issues were.**
20    Q.  To investigate the claims?
21    **A.  Yes.**
22    Q.  To investigate his issues, right?
23    **A.  His issues, to find out what was going on.**
24    Q.  Was McLain suspended at the same time?
25    **A.  I don't believe so.**

**RICKY LONGO**
**July 6, 2011**

33

1  Q.  So the man who made the accusations was
2  suspended, but the man against whom the accusations had
3  been made wasn't suspended initially?
4  **A.  That's not how it happened.**
5  Q.  Okay.  Mr. Onorato made allegations against
6  Mr. McLain, right?
7  **A.  Right, and we addressed it.**
8  Q.  So you're saying that Onorato wasn't
9  suspended at that time?
10  **A.  No.**
11  Q.  When was he suspended?  After the letter from
12  the attorney?
13  **A.  Correct.**
14  Q.  And by the letter to the attorney, I mean
15  Exhibit 3, right?
16  **A.  Correct.**
17  Q.  Did you see that letter when it came in?
18  **A.  Not immediately, but probably shortly after.**
19  Q.  And Mr. Onorato was suspended as a result of
20  that?
21  **A.  As a result of the discussion based on**
22  **looking into all of that, yes.**
23  Q.  So that -- and the purpose of the suspension
24  was so the company could investigate his allegations?
25  **A.  Yes.**

34

1  Q.  What was your understanding as to why it was
2  necessary to suspend him while that investigation took
3  place?
4  **A.  Sales floors are really delicate and gossip,**
5  **bad publicity, bad press, people talking negative**
6  **really can just bring a sales floor to a complete stop**
7  **or really hurt the sales.  So it was because of that.**
8  Q.  It was because of the possibility of that, or
9  was it because that was happening?
10  **A.  It was because of the possibility.**
11  Q.  All right.  It hadn't happened yet, correct?
12  **A.  Not to my knowledge.**
13  Q.  You took it as a precautionary measure to
14  send him home?
15  **A.  Correct.**
16  Q.  And the company believed that it would be
17  temporary so that it could investigate his allegations,
18  right?
19  **A.  Correct.**
20  Q.  But it ended up not being temporary when he
21  filed the lawsuit, right?
22  **A.  I don't think that was immediate, but**
23  **eventually it became that, yes.**
24  Q.  And that was the thing that changed
25  everything, right, was the filing of this lawsuit?

35

1  **A.  Yes.**
2  Q.  Sir, how long have you worked in the debt
3  settlement business or -- I'm sorry -- the debt
4  settlement industry is I guess the way to...
5  **A.  Since January 2010.**
6  Q.  Okay.  Do you know roughly what percentage of
7  Americans need debt settlement help?
8  **A.  Do I know, no, I don't know.**
9  Q.  Do you know if it's more than 50 percent?
10  **A.  It depends on the reports you read.**
11  Q.  Is there a certain threshold of debt that a
12  person has to have in order to be eligible for debt
13  settlement help?
14  **A.  I think that probably varies with certain**
15  **companies, but...**
16  Q.  So it just -- so there's no -- to your
17  knowledge, there's no law or regulation on it.  It's
18  simply a matter of some companies might help somebody
19  with $5,000 in debt and some company might require 20
20  grand in debt to get involved.  Is that what you mean?
21  **A.  Yes.**
22  Q.  All right.  If we were to request documents
23  showing Mr. Onorato's performance during the time that
24  he was there compared to other senior debt analysts,
25  what documents would we request?

36

1  **A.  Production reports are what come to mind.**
2  Q.  And you have those, right?
3  **A.  Yes, we have those.**
4  Q.  Was Mr. Onorato ever warned about his
5  performance?
6  **A.  Yes.**
7  Q.  Who warned him?
8  **A.  I believe Kevin Devoto.  I don't know if it**
9  **was Khris, too.**
10  Q.  Do you know whether when the -- when he was
11  removed from being a team lead, his performance
12  improved?
13  **A.  I don't recall.**
14  Q.  Was he ever written up for poor performance?
15  **A.  I don't know how the sales managers actually**
16  **handle that, so I don't know if it was written or if it**
17  **was verbal.**
18  MR. WARD:  You want to take a break for
19  five minutes?
20  MR. WOOD:  Okay.
21  (Recess taken, 1:26 to 1:44)
22  Q.  (By Mr. Wood) Sir, do you know when
23  Mr. Onorato complained about -- when he first
24  complained about Mr. McLain?
25  **A.  I don't remember the date.**

**RICKY LONGO**
**July 6, 2011**

37

1    Q.  Just ballpark when it was.
2    A.  I don't remember.
3    Q.  All right.  One of the things that was
4  produced to us in discovery was, I guess, a copy of the
5  employee handbook at ABC, and I'll show it to you.  One
6  of the things it talks about in there is progressive
7  discipline.
8        Are you familiar with that term,
9  progressive discipline?
10   A.  Yes.
11   Q.  What does that mean to you?
12   A.  It means you -- if there is an infraction and
13  basically you violate a policy, that the first time
14  would be at a certain level of punishment.  And if it
15  continues, it gets progressively worse.
16   Q.  Yes.  Maybe a verbal warning the first time
17  and a written warning the second and a suspension and
18  then maybe termination, something like that?
19   A.  Yes.
20   Q.  You told me that Mr. Onorato had been
21  verbally warned about his performance but never warned
22  in writing; is that correct?
23   A.  I don't know that to be a fact, but I don't
24  know of anything that I wrote.
25   Q.  When was he verbally warned about his

38

1  performance?
2    A.  One time that I witnessed it, and there was a
3  discussion.  Would have been in a team leader meeting.
4    Q.  When was that?
5    A.  In the springtime sometime.  I don't know
6  exactly when.
7    Q.  Was it March or April?
8    A.  Yeah, somewhere in that time frame.
9    Q.  And you witnessed it?
10   A.  Yes.
11   Q.  To the best of your recollection, what was
12  said?
13   A.  The discussions were along the lines of time
14  spent on the phones.
15   Q.  Too much time?
16   A.  Not enough time.
17   Q.  Okay.  Anything else?
18   A.  I don't recall all the detail.  I mean, I
19  wasn't the one dictating it.  I was just there.
20   Q.  You were there?
21   A.  Yes.
22   Q.  When it was said, right?
23   A.  Yes.
24   Q.  And you said the person that said it was
25  Kevin Devoto?

39

1    A.  Correct.
2    Q.  And there were several people present?
3    A.  Yes.
4    Q.  How many people?
5    A.  Probably seven or eight.
6    Q.  Were they all peers of Mr. Onorato, or were
7  some of them below him?
8    A.  It was either management or peers, as far as
9  sales reps.  I don't know that there was any below him.
10  I don't know what the term below him would be.
11   Q.  Well, somebody -- if you did an
12  organizational chart and you put the CEO at the top and
13  put you below that and put Mr. Onorato down, was there
14  anybody below him on the organizational chart, below
15  him that was at that meeting?
16   A.  I don't recall.  Maybe our marketing person
17  might have been there.
18   Q.  Would you agree with me that given that there
19  were six or seven people present that it must not have
20  been a very serious reprimand?
21   A.  It's always serious when you're talking
22  production.
23   Q.  But it wasn't -- it wasn't a you better
24  improve or you're going to be fired kind of talk, was
25  it?

40

1    A.  No.
2    Q.  And, as a matter of fact, when he was
3  suspended after his lawyer sent the letter, when he was
4  suspended he could have kept work -- he could have kept
5  working there had the letter not been sent, right?
6    A.  Yes.
7    Q.  All right.  He worked inside for you the
8  whole time, right?  He was an inside person, not
9  outside?
10   A.  Yes.
11   Q.  Mr. Onorato, since he was suspended, has
12  never been allowed to come back to ABC Debt Relief, has
13  he?
14   A.  Correct.
15   Q.  Who made the decision -- who within ABC made
16  the decision to not pay him overtime?
17   A.  The decision?
18   Q.  Yes.  Let me ask it a different way.
19        You're familiar with the terms, they're
20  exempt employees and there are nonexempt employees,
21  right?
22   A.  Yes.
23   Q.  Who made the decision to classify him as
24  exempt and therefore not pay him overtime?
25        MR. WARD:  Objection, form.

**CSI GLOBAL DEPOSITION SERVICES**
**972-719-5000**

**RICKY LONGO**
**July 6, 2011**

41

1      Go ahead.
2      **A.  Sales reps were 100 percent commissioned, so**
3  **I don't understand how there would be any hourly**
4  **request.**
5      Q.  (By Mr. Wood) Okay.  All right.  Who within
6  ABC made the decisions on how employees were paid?
7      **A.  That was decided before I joined the**
8  **company.  That was a matter of record.**
9      Q.  Okay.
10          MR. WOOD:  Can I talk to him for just a
11  minute?
12          MR. WARD:  Sure.
13          (Recess taken, 1:50 to 1:52)
14      Q.  (By Mr. Wood) Sir, I'm going to get the name
15  wrong, but was one of your team leads named Edwin --
16  his last name is spelled N-Y-A-N --
17      **A.  Nyanweya.**
18      Q.  N-Y-A-N-W-E-Y-A.  He was one of your team
19  leads, right?
20      **A.  Yes.**
21      Q.  Just like Mr. Onorato?
22      **A.  Yes.**
23      Q.  His performance wasn't as good as
24  Mr. Onorato's, was it?
25      **A.  I don't remember exactly.  They're all**

42

1  **streaky.  I mean, no rep can sell all.  I shouldn't say**
2  **no rep, but for the most part a majority of our reps**
3  **could never sell that consistently, even like kick that**
4  **out in any one day.**
5      Q.  I'm not really talking about one day.  I'm
6  asking for an overall assessment.
7          Isn't it true that Mr. Onorato was a
8  better performer than he was?
9      **A.  He sold more accounts.**
10      Q.  And therefore was a better performer, right?
11      **A.  Is that your sole measure?**
12      Q.  Well, tell me what else I should be
13  measuring.
14      **A.  How many accounts stay on the books.**
15      Q.  All right.  And are you telling me you've
16  done an assessment of how many of Onorato's accounts
17  have stayed on the books?
18      **A.  We look at all of our sales reps as far as**
19  **cancellation rates, yes.**
20      Q.  When Mr. Onorato was demoted, was that
21  decision based in part upon failure of his accounts to
22  stay on the books?
23      **A.  No.**
24      Q.  All right.  It was based on sales numbers,
25  right?

43

1      **A.  Yes.**
2      Q.  And on the measure of sales numbers,
3  Mr. Onorato was better than Mr. Edwin -- however you
4  pronounce his last name -- right?  Isn't that correct?
5      **A.  Yes.**
6      Q.  Yet Mr. Edwin was never demoted, was he?
7      **A.  No.**
8      Q.  Is he still a team lead?
9      **A.  No.  He is not in the debt business anymore.**
10      Q.  Does he still work for the company?
11      **A.  He works for a different company now.**
12      Q.  He doesn't work for ABC?
13      **A.  No.**
14      Q.  Which company does he work for, if you know?
15      **A.  He works for CTR Tax Relief.**
16      Q.  Why did he leave ABC?
17      **A.  For a better opportunity.**
18      Q.  It was his decision?
19      **A.  His decision.**
20      Q.  To the best of your knowledge, was he on any
21  kind of progressive discipline at the time?
22      **A.  No.**
23      Q.  So he could have stayed?
24      **A.  Yes.**
25          MR. WOOD:  Pass the witness.

44

1          EXAMINATION
2      Q.  (By Mr. Ward) Just a handful of things for
3  you.
4          One, I want to make sure that we get
5  some clarification.  In regard to people that actually
6  work for ABC Debt Relief, they're employees.  Ones that
7  do the sales and marketing, who pays their salary?
8      **A.  ABC.**
9      Q.  Are they reimbursed in any form by Lloyd Ward
10  & Associates?
11      **A.  No.**
12      Q.  And.  In fact, is --
13          MR. WOOD:  Is who reimbursed?
14      Q.  (By Mr. Ward) Is ABC reimbursed for those
15  employees?
16      **A.  No.**
17      Q.  Is what ABC -- that's part of what Lloyd Ward
18  & Associates hires ABC and that's part of what comes
19  with that package, right?
20      **A.  Oh, as far as what we're --**
21      Q.  Your employees --
22      **A.  Our performance?  Yes.**
23      Q.  Sales and marketing.
24      **A.  That is where they're employed, through sales**
25  **and marketing.**

**CSI GLOBAL DEPOSITION SERVICES**
**972-719-5000**

**RICKY LONGO**
**July 6, 2011**

45

1      MR. WOOD:  Objection to form.
2      Go ahead.
3      Q.  (By Mr. Ward) In regard to the people that do
4  either -- and I call them paralegals and you've been
5  calling them I believe credit -- what was the term that
6  you used?  The back-end people that actually talk to
7  the creditors?
8      A.  **Negotiators.**
9      MR. WOOD:  Object to form, and leading.
10     Q.  (By Mr. Ward) Okay.  Negotiators.  With regard
11 to negotiators, as I call them paralegals, who pays --
12 who initially makes their paycheck?  Who pays them?
13 Who are their checks issued through?
14     A.  **Through ABC.**
15     Q.  And is ABC reimbursed by Lloyd Ward &
16 Associates for all that pay?
17     A.  **Yes.**
18     Q.  And in regard to the quality assurance
19 personnel, who are they paid by?
20     A.  **ABC.**
21     Q.  And are they reimbursed by Lloyd Ward &
22 Associates?
23     A.  **Yes.**
24     Q.  And, in fact, the reimbursement, does that
25 also include additional fees paid to ABC for the HR

46

1  personnel and accounting, the other things that go with
2  the leasing program?
3      A.  **Yes.**
4      Q.  So ABC may make the initial payment, but
5  under the agreement, all those expenses, including
6  admin expenses, are reimbursed by Lloyd Ward &
7  Associates, correct?
8      A.  **Yes.**
9      Q.  Is Mr. McLain still with ABC?
10     A.  **No.**
11     Q.  Why was Mr. McLain ultimately let go?
12     A.  **Production.**
13     Q.  Okay.
14     A.  **Lack of.**
15     Q.  At the time that Mr. McLain was disciplined
16 in regard to the letter in the earlier testimony, was
17 Mr. Onorato still here?
18     A.  **Yes.**
19     Q.  So Mr. Onorato brought the issue to your
20 attention, correct?
21     A.  **Uh-huh.**
22     Q.  And in response to that, you disciplined
23 Mr. McLain, correct?
24     A.  **Correct.**
25     Q.  And then after all of that happened, is that

47

1  when the letter from the attorney arrived?
2      A.  **Yes.**
3      Q.  In regard to sales and marketing, are there
4  different -- and you keep referring to them as teams.
5  Are different teams made up of people that work
6  together in groups in sales and marketing?  Is that
7  correct?
8      A.  **Yes.**
9      Q.  And was one of the problems with bringing
10 Mr. Onorato back the fact that after Mr. McLain had
11 already been disciplined that suddenly there was a
12 lawsuit filed and all of these allegations were
13 suddenly being published and so Mr. Onorato would have
14 been put back into the group with the very people that,
15 one, he was suing their company, and, two, he had made
16 the allegations against?
17     A.  **Correct.**
18     MR. WOOD:  Objection to leading.
19     Q.  (By Mr. Ward) Was that part -- at least part
20 of what your discussion with Kevin was in regard to
21 Mr. Onorato versus Mr. McLain?
22     A.  **Yes.**
23     MR. WOOD:  Same objection.
24     Q.  (By Mr. Ward) Do you feel that after the
25 letter and after the lawsuit if Mr. Onorato had been

48

1  brought back into the group, what was your opinion as
2  to what his relations would have been with the rest of
3  the group, including Mr. McLain?
4      MR. WOOD:  Object to form.
5      A.  **I think it would have been an issue.  I think**
6  **it would have been a distraction and I think there**
7  **would have been animosity amongst the floor.**
8      Q.  (By Mr. Ward) So it wasn't just production the
9  reason that Mr. Onorato was not brought back, correct?
10     A.  **Correct.**
11     Q.  Okay.  In regard to the work that's done, the
12 sales force that is out there, do they work intrastate
13 or do they work interstate?
14     MR. WOOD:  Object to form.
15     A.  **They represent 37 states.**
16     Q.  (By Mr. Ward) So Texas is one of those states,
17 correct?
18     A.  **Correct.**
19     Q.  And do you even know the percentage of the
20 clients in Texas as opposed to the other 36 states?
21     A.  **Only ballpark.**
22     Q.  What would the ballpark be?
23     A.  **5, 6, maybe 7 percent, somewhere in that**
24 **range.**
25     Q.  And the bulk of the work that was performed

**RICKY LONGO**
**July 6, 2011**

49

1   would be interstate, correct?
2   **A.   Correct.**
3   Q.   Are all of the sales and marketing conducted
4   either over telephone lines or Internet communication
5   lines, IP, I believe it is?
6   **A.   Yes.**
7   Q.   What is the telephone system again?
8   **A.   It's a voice over IP system.**
9   Q.   Which is Internet telephones, correct?
10  **A.   Internet, correct.**
11  Q.   So commercial interstate lines are used,
12  correct?
13  **A.   Correct.**
14         MR. WARD:  I'll pass the witness.
15             EXAMINATION
16  BY MR. WOOD:
17  Q.   ABC set up a Web site that was on the
18  Internet anywhere in the world really, right?
19  **A.   Yes.**
20  Q.   Sir, in the discussions about whether to
21  bring Mr. Onorato back or not, was it ever contemplated
22  possibly transferring him to a different group so he
23  wouldn't be in the vicinity of Mr. McLain?
24  **A.   No.**
25  Q.   That was possible to do, wasn't it?

50

1   **A.   No.**
2   Q.   Why not?
3   **A.   There was no other place to put him.  Where**
4   **do you put a sales rep except to sell?**
5   Q.   How many different teams were there?
6   **A.   They were all on the same floor.**
7   Q.   How many different teams were there?
8   **A.   Six.**
9   Q.   They didn't have to be on the same team, did
10  they?
11  **A.   No.**
12  Q.   And isn't it true, sir, that for the most
13  part, if you're a senior debt analyst like Mr. Onorato,
14  you spent your time either dealing with your other team
15  members or dealing with the customers that you're
16  talking with on the phone, right?
17  **A.   Supposed to.**
18  Q.   That's how -- that's what, in fact, happens,
19  right?
20  **A.   Not 24/7.**
21  Q.   Right.  But I mean --
22  **A.   They talk a lot, the reps.**
23  Q.   But the work to be done involves working with
24  the -- talking with the customers and working with the
25  other team members, right?

51

1   **A.   Yes.**
2   Q.   So the only interaction that he would have
3   had with Mr. McLain would have been whatever social
4   interaction they had just being on the floor together,
5   right?
6   **A.   Yes.**
7   Q.   How big was the floor?
8   **A.   About 1500 square feet.**
9   Q.   Fifteen hundred square feet.  And how many
10  people were in that area?
11  **A.   About 25, 30.**
12  Q.   Would it have been possible to put
13  Mr. Onorato and Mr. McLain as far apart as possible?
14  **A.   Yes, that is possible.**
15  Q.   Did the company consider bringing Mr. Onorato
16  back and giving both him and Mr. McLain a stern
17  warning, you guys better get along?  If you don't, one
18  or both of you is going to be gone?
19  **A.   No.**
20  Q.   That wasn't considered or wasn't done?
21  **A.   No.**
22  Q.   No what?
23  **A.   It wasn't considered, because it didn't**
24  **happen at the same time.**
25  Q.   What didn't happen at the same time?

52

1   **A.   Mr. McLain was let go and put on suspension**
2   **and brought back before Mr. Onorato was ever even**
3   **suspended.**
4   Q.   No.  I understand.  But you just told
5   Mr. Ward that the concern about bringing Mr. Onorato
6   back was that it would have caused employee issues,
7   mainly with Mr. McLain, I assume, right?
8   **A.   No.  You assume wrong.**
9   Q.   Okay.  Well, who?
10  **A.   With every single sales rep.**
11  Q.   Why is that?
12  **A.   Because sales reps, when you make information**
13  **public, to have one person who is bringing allegations**
14  **against the company, be in a room with 40 people that**
15  **all do the same thing and don't agree, it's a**
16  **distraction.  It has nothing to do with one person.**
17  Q.   Twenty-five people or 40 people?
18  **A.   We have fluctuated anywhere from 25 to 40 at**
19  **some point in time.  We've gone up and down.**
20  Q.   Did the company consider bringing Mr. Onorato
21  back and let everybody on the floor know, we all need
22  to get along with each other or we're going to have to
23  take appropriate action?
24  **A.   If we considered it even for a half second,**
25  **that was impossible.  It was really not in the cards.**

**RICKY LONGO**
**July 6, 2011**

53

1    Q. It was impossible?
2    **A. Right. We did not see a chance for that to**
3    **be anything but a distraction.**
4    Q. And given that you say it is impossible, I'm
5    sure what that means is you've been in another company
6    where the same thing has happened before and you've
7    seen it gone bad. Is that right? Or you're just
8    speculating it will be a bad situation?
9    **A. No. I've seen it gone bad before.**
10   Q. Well, you've seen it be the case where
11   another company was threatened legal action and the
12   company brought him back and there was an adverse
13   consequence?
14   **A. Not in that exact context, no.**
15   Q. Sir, you said something that confused me. In
16   response to one of Mr. Ward's questions. I thought I
17   heard you to say that ABC pays the paralegals who work
18   for Mr. Ward's law firm. Is that right?
19   **A. Yes. We pay all the payroll.**
20   Q. So the paralegals who work on this 10th floor
21   who are -- who are legal assistants of Lloyd Ward &
22   Associates law firm, they are paid by ABC Debt Relief.
23   **A. Yes.**
24   Q. Their paychecks say ABC?
25   **A. Yes, they do.**

54

1    Q. Interesting. So does ABC do the hiring of
2    Mr. Ward's paralegals?
3    **A. That's under his supervision. We just pay**
4    **the -- we process the payroll. He makes the**
5    **determination on who is going to work for him and who**
6    **is not.**
7    Q. So does ABC even pay the paralegals who
8    aren't involved in debt settlement work?
9    **A. I think so.**
10   Q. That's what your understanding is?
11   **A. Yes.**
12   Q. So if Mr. Ward has a corporate lawyer in his
13   firm who is not in any way -- or an SEC lawyer, let's
14   say, who is not in any way involved in debt settlement
15   and that lawyer has a paralegal, that paralegal gets
16   paid by ABC Debt Relief?
17   **A. Maybe in part.**
18   Q. Why are you hesitating?
19   **A. Because most of the paralegals up here do the**
20   **work for the debt. So, I mean, there's always some**
21   **crossover.**
22   Q. All right. Where does ABC Debt Relief do its
23   banking?
24   **A. Chase Bank.**
25   Q. Chase Bank?

55

1    **A. Yes.**
2    Q. Well, you know, right?
3    **A. Yes.**
4    Q. You're CFO?
5    **A. Yes.**
6    Q. And you don't have to guess about that,
7    right?
8    **A. We have many banks.**
9    Q. Chase, and what are the other ones?
10   **A. For ABC, actually it is just Chase.**
11   Q. Well, given your answer to that question, you
12   give me the impression that you're not just running
13   ABC Debt Relief. You're working for other companies,
14   too?
15   **A. There are other companies, yes.**
16   Q. That you're working for?
17   **A. Yes.**
18   Q. Which other companies do you work for?
19   **A. Let's see. I work for a company called CRLK,**
20   **LLC.**
21   Q. C --
22   **A. RLK, LLC.**
23   Q. What is that?
24   **A. This is a tax settlement company.**
25   Q. Are you employed by that company?

56

1    **A. Not directly, no.**
2    Q. I don't understand what you mean not
3    directly.
4    **A. In all instances, ABC stands as the company**
5    **who oversees our management team, helps out in any**
6    **vertical that we're involved in.**
7    Q. Okay. So CRLK, LLC. Which other companies
8    do you work for?
9    **A. There is LRKD Auto.**
10   Q. LRKD?
11   **A. Yes.**
12   Q. What is that?
13   **A. That's service -- auto service contract**
14   **company.**
15   Q. Which other ones?
16   **A. That's it.**
17   Q. Do either of those companies pay Mr. Ward's
18   paralegals?
19   **A. No, not at all.**
20   Q. All right. What's your understanding as to
21   why ABC Debt Relief pays paralegals who are employed by
22   a law firm?
23   **A. All we do is facilitate the payroll.**
24   Q. Yes. But the checks don't say Lloyd Ward &
25   Associates. The checks say ABC Debt Relief, right?

**RICKY LONGO**
**July 6, 2011**

15 (Pages 57 to 60)

57

1      A.  Yes.
2      Q.  Why?  What is the purpose for that?
3      **A.  Because we had one payroll account open for**
4  **it so we process it through the one payroll account.**
5  **We're able to show all the employees that are**
6  **associated with Lloyd Ward so it's very easy to break**
7  **out.**
8      Q.  And the law firm gives you the money to pay
9  for them?
10     A.  Yes.
11     Q.  Is the law firm giving money -- all right.
12         MR. WOOD:  That's all I have.  Thank
13  you, sir.
14         MR. WARD:  Okay.
15         (Proceedings concluded, 2:10)
16
17
18
19
20
21
22
23
24
25

58

1          CHANGES AND SIGNATURE
2  WITNESS:  RICKY LONGO July 6, 2011
3  PAGE   LINE   CHANGE   REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

59

1      I, RICKY LONGO, have read the foregoing deposition
2  and hereby affix my signature that same is true and
3  correct, except as noted above.
4
5
6
7          _____
            RICKY LONGO
8
9
10 THE STATE OF _____ )
11 COUNTY OF _____ )
12
13     Before me, _____,
   personally appeared RICKY LONGO, known to me (or proved
14 to me under oath or through _____)
   (description of identity card or other document) to be
15 the person whose name is subscribed to the foregoing
   instrument and acknowledged to me that they executed
16 the same for the purposes and consideration therein
   expressed.
17
       Given under my hand and seal of office this
18 _____ day of _____, _____.
19
20
21         _____
            NOTARY PUBLIC IN AND FOR
22          THE STATE OF _____
23
24
25

60

1  STATE OF TEXAS   *
2  COUNTY OF DALLAS  *
3      This is to certify that I, Deborah Marks,
4  Certified Shorthand Reporter, in and for the State of
5  Texas, certify that the foregoing oral deposition of
6  RICKY LONGO, reported stenographically by me at the
7  time and place indicated, said witness having been
8  placed under oath by me, and that the oral deposition
9  is a true record of the testimony given by the witness.
10     I further certify that I am neither counsel for
11 nor related to any party in the case and am not
12 financially interested in its outcome.
13     Given under my hand on this the _____ day of
14 _____, 2011,
15
16
17
18
19
20 Deborah Marks, Texas CSR
   Expiration date: 12/31/12
21 Firm No. 526
   Corporate Plaza, Suite 152
22 4950 N. O'Connor Road
   Irving, Texas 75062
23 972.719.5000
   972.717.3985
24
25

**CSI GLOBAL DEPOSITION SERVICES**
**972-719-5000**

App. 18

**LLOYD WARD**
**July 6, 2011**

1 (Pages 1 to 4)

---

**1**

```
 1        UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF TEXAS
 2             DALLAS DIVISION
 3   G. CHRIS ONORATO,        *
                              *
 4      Plaintiff,           *
                              *
 5   VS.              *  CIVIL ACTION
                     *  NO. 3:10-CV-1791
 6   ABC DEBT RELIEF, LTD. CO.,  *
     LLOYD REGNER AND KEVIN    *
 7   DEVOTO, LLOYD WARD &       *
     ASSOCIATES AND LLOYD WARD, *
 8                            *
        Defendants.          *
 9
10   ***********************************
11          ORAL DEPOSITION OF
12          LLOYD EUGENE WARD
13             JULY 6, 2011
14   ***********************************
15
16      ANSWERS AND ORAL DEPOSITION OF LLOYD EUGENE WARD,
17   produced as a witness at the instance of the Plaintiff,
18   and duly sworn, was taken in the above-styled and
19   numbered cause on the 6th day of July, 2011 from 9:15
20   a.m. to 11:34 a.m., before Deborah Marks, CSR in and
21   for the State of Texas, reported stenographically, at
22   the offices of Lloyd Ward & Associates, 12655 LBJ
23   Freeway, Suite 1000, Dallas, Texas, pursuant to the
24   Federal Rules of Civil Procedure and the provisions
25   stated on the record.
```

---

**2**

```
 1          A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF:
       Mr. Robert J. Wood, Jr.
 4     FELL & WOOD, LLP
       3021 East Renner Road
 5     Suite 140
       Richardson, Texas 75082
 6     972.488.8177
 7
     FOR THE DEFENDANTS:
 8     Mr. Lloyd Ward
       LLOYD WARD & ASSOCIATES
 9     12655 LBJ Freeway
       Suite 1000
10     Dallas, Texas 75243
       972.361.0036
11
12   ALSO PRESENT:  Mr. G. Chris Onorato
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**3**

```
 1               I N D E X
 2   WITNESS                          PAGE
     LLOYD EUGENE WARD
 3
     EXAMINATION
 4     BY: Mr. Wood....................................4
 5   Changes and Signature.............................78
 6   Reporter's Certificate............................80
 7          EXHIBITS
 8   NUMBER      DESCRIPTION        IDENTIFIED
 9   Exhibit 1  Web site, Lloyd Ward & Associates......16
10   Exhibit 2  E-mail................................58
11   Exhibit 3  Letter, 7/1/10, Charles Branham to
                 Lloyd Regner, Kevin Devoto, et al......61
12
13   Exhibit 4  E-mail stream.........................63
14   Exhibit 5  E-mail, 7/6/10........................65
15   Exhibit 6  E-mail, 7/7/10........................66
16
17
18
19
20
21
22
23
24
25
```

---

**4**

```
 1          P R O C E E D I N G S
 2          LLOYD EUGENE WARD,
 3   having been duly sworn, testified as follows:
 4          EXAMINATION
 5   BY MR. WOOD:
 6      Q.  Would you state your name, please, sir.
 7      A.  Lloyd Eugene Ward.
 8      Q.  Sir, what is your residential address?
 9      A.  6040 Preston Creek, Dallas, Texas 75040.
10      Q.  You're an attorney, correct?
11      A.  Correct.
12      Q.  You're a partner at Lloyd Ward & Associates?
13      A.  Yes.
14      Q.  Are you the only partner?
15      A.  Currently I am the only partner.
16      Q.  Lloyd Ward & Associates is in the debt
17   settlement business; is that correct?
18      A.  It -- I pause.  That's one of the things we
19   do, yes.
20      Q.  How long has it been in that business?
21      A.  We've been doing workouts for people for
22   probably 15 or 20 years.
23      Q.  How long have you been a partner in this law
24   firm?
25      A.  I want to say the law firm was found in
```

---

**CSI GLOBAL DEPOSITION SERVICES**
**972-719-5000**

**LLOYD WARD**
**July 6, 2011**

5

1992.

2    Q.   You've been a partner since then?

3    A.   Yes.  I formed the law firm.

4    Q.   When did you most recently have another

5  partner?

6    A.   John Long was my last partner, and that would

7  have been in roughly 2007, 2008, through that time

8  period.

9    Q.   You say you've been doing workouts for 15 or

10  20 years.  Is that a synonym for doing debt settlement?

11    A.   Yes.

12    Q.   If you were trying to get clients, in other

13  words, trying to get debt settlement clients, would

14  picking up a Dallas telephone book and just calling

15  names randomly be a good way to get clients?

16    A.   No.  It's prohibitive.

17    Q.   Other than it being ethically prohibitive,

18  just assume that it wasn't prohibitive, would it be a

19  good way for getting clients for debt settlement?

20    A.   No.

21    Q.   Why not?

22    A.   Dallas proper has a population -- Dallas

23  County of approximately 2.2 million people.  The

24  randomness of doing phone calls would be -- compared

25  with the cost -- the cost of acquisition would be

6

1  astronomical.

2    Q.   Are there leads lists that you could purchase

3  that would give you some better candidates for debt

4  settlement clients as opposed to just a telephone book?

5    A.   I don't know.

6    Q.   Do you know roughly what percentage of people

7  in America at some point use debt settlement services?

8    A.   No, I don't have any idea.

9    Q.   Do you know if it is less than 50 percent?

10    A.   I honestly don't have any idea.  I know the

11  majority of Americans have credit cards and have debt

12  problems.  But the number of those people that use debt

13  settlement services, I couldn't fathom.

14    Q.   You say the majority of people have credit

15  cards, right?

16    A.   Yes.

17    Q.   And you say that the majority of Americans

18  have debt problems?

19    A.   Yes.

20    Q.   How would you define a debt problem?

21    A.   Can I give you my 2-minute spiel on it?

22    Q.   Sure.

23    A.   Okay.  I am now officially old enough to say

24  back in the day, but when I graduated from the

25  University of Arkansas, my undergraduate degree was in

7

1  finance and banking with a minor in accounting.  And at

2  that point in time -- and this would have been in the

3  1979, '80 '81, '82 era -- what you looked at when you

4  were going to make a loan was you looked to see how

5  long they had a job.  You looked for savings accounts,

6  you looked to see what their total credit was and your

7  house payments couldn't be more than 20 percent of what

8  your net income was.  And there was a nice formula that

9  was built out.

10    And over the last roughly 30 years, the

11  banks have convinced us that you don't really need to

12  own anything.  And back at that point in time in '76

13  when I bought my first car, you could get 24 month

14  financing and maybe 36 if you had good financing.  So

15  what we've done over the last 30 years is people have

16  been convinced that you don't need to own anything.

17    If you want a car, lease it.  And if you

18  can't afford to lease, we'll finance it for 72 months

19  so your warranty expires before your payment is due.

20  If you own a house, in the old days, you had a 15-

21  maybe a 20-year mortgage, depending on the payments.

22  And the goal was you paid your house off and you

23  retired and you owned your house.  Now we've been

24  convinced that you don't need to own your house.  If

25  you get equity, you can pull your equity out and spend

8

1  it.

2    And, likewise, I didn't have my first

3  credit card, nor did my father, until the late '80s --

4  '87, '88, '89.  But we've now been convinced that we

5  should literally finance everything from our lunches at

6  the McDonald's, to our drinks at the local bar, to

7  anything you want, put it on a credit card.

8    So instead of owning, we have known been

9  convinced that all we have to be able to do is debt

10  service.  So that's the reason I say in my opinion I

11  think we do have a problem with it because people have

12  now gained the attitude you don't need the house you

13  can buy.  All you've got to be able to do is make

14  interest payments.  So instead of buying a 3,000 square

15  foot house, let's buy an 8,000 square foot house.

16  Instead of buying a Ford, Chevy or Chrysler, let's go

17  lease a BMW or Mercedes.  And as long as you've got any

18  credit on your credit card, instead of eating at home

19  or going to the grocery store for groceries, let's go

20  down to Ocean Prime and have dinner.  So in my opinion,

21  I think that is a problem.

22    Q.   Was Chris Onorato employed by ABC Debt

23  Relief?

24    A.   Yes.

25    Q.   When he was employed by ABC Debt Relief what

**LLOYD WARD**
**July 6, 2011**

9

1  type of debt settlement services did you, Lloyd Ward &
2  Associates, offer?
3      A. Now, I'm subject to being wrong, but my
4  understanding was that he actually worked with ABC in
5  the marketing and sales department. He wasn't working
6  with Lloyd Ward in the servicing department. That's
7  two separate departments.
8          MR. WOOD: I'm going to object to that
9  as nonresponsive.
10     Q. (By Mr. Wood) Let me ask the question again.
11         When Mr. Onorato was employed by ABC
12  Debt Relief, what type of debt settlement services did
13  Lloyd Ward & Associates offer?
14     A. At that point in time, what we offered was we
15  agreed to represent clients on a limited basis. The
16  limited basis being we would represent them strictly in
17  regard to contacting their creditors and negotiating
18  and verifying the debts under the Fair Debt Collection
19  Practices Act, as well as the Fair Debt Collection
20  Reporting Act issues, and then attempt to negotiate a
21  settlement with those creditors based solely on the
22  federal acts. No state representation was implied and
23  was specifically excluded.
24     Q. So the attempt was to convince the creditors
25  to take less than the full amount.

10

1      A. Yes.
2      Q. Okay. And that's what was done when
3  Mr. Onorato was employed by ABC Debt Relief?
4      A. And I --
5      Q. To the best of your recollection?
6      A. And, again, my understanding was he worked
7  with them on sales and marketing, not on the creditor
8  side of this in regard to what Lloyd Ward & Associates
9  in negotiating the debt. Do you understand there's two
10  different...
11         MR. WOOD: Yes. I'm going to object as
12  being responsive again.
13     A. Okay. I mean, when you ask it, you're
14  intermingling the two companies. And what I'm saying
15  is I'm not sure what he did at ABC. I know what we did
16  on our end of it.
17         MR. WOOD: I'm going to object again as
18  being nonresponsive.
19     Q. (By Mr. Wood) But my purpose here, I just -- I
20  want us to agree that when we talk about the debt
21  settlement services that Lloyd Ward & Associates
22  offered during that time what we're talking about is
23  the negotiation with creditors to try to convince them
24  to take less than the full amount that was owed.
25     A. Yes.

11

1      Q. Is that correct?
2      A. That's correct.
3      Q. All right. What was -- and maybe it's the
4  same now as it was then. When Mr. Onorato was employed
5  by ABC Debt Relief, what was that company? What did it
6  do?
7      A. That company was a sales and marketing
8  company.
9      Q. Is it still today?
10     A. No. My understanding of -- based on the new
11  FTC rules that came down on October 27, they pretty
12  much shut all the sales and marketing down across the
13  board. So my understanding is that they had -- I'm not
14  going to say they've gone out of business. I think
15  there's still some business that they're doing, but for
16  the most part, I think they've cut back.
17     Q. And when you say October 27, you mean October
18  27, 2010?
19     A. Yes, sir.
20     Q. So before that time, it was a sales and
21  marketing company?
22     A. Yes.
23     Q. And specifically -- well, let me ask you
24  this -- strike that.
25         Who started ABC Debt Relief?

12

1      A. Lloyd Regner and Kevin Devoto.
2      Q. Were they the only owners of ABC Debt Relief?
3      A. I honestly don't know. They were my point
4  contacts at work.
5      Q. Were you ever an owner?
6      A. No.
7      Q. Were you an officer?
8      A. No.
9      Q. Were you ever a partner of either Lloyd
10  Regner or Kevin Devoto?
11     A. No.
12     Q. Did you ever hold yourself out as being their
13  partner?
14     A. No.
15     Q. Do you know if they held themselves out as
16  being your partner?
17     A. Not that I'm aware of.
18     Q. Do you know whether Kevin Devoto has ever
19  been convicted of a felony?
20     A. I know he had SEC issues, but I don't know if
21  there was ever any criminal conviction.
22     Q. When you say that ABC Debt Relief was a sales
23  and marketing company, is it true that it was a sales
24  and marketing company for Lloyd Ward & Associates?
25     A. I was one of their clients, yes.

**LLOYD WARD**
**July 6, 2011**

13

1    Q.  And just to get a clean answer to the
2  question, was ABC Debt Relief a sales and marketing
3  company for Lloyd Ward & Associates?
4    **A.  Yes, it was.**
5    Q.  Which other companies performed sales and
6  marketing services for Lloyd Ward & Associates?
7    **A.  Silver Leaf Debt Services did here locally,**
8  **and we also used a pay per click company that is Click**
9  **4, I believe is the name of it.  And we also -- we've**
10 **got two other marketing companies and you would have to**
11 **ask our marketing director what their names are, but**
12 **we've got -- I mean, we've got several different**
13 **marketing companies that do various forms of marketing**
14 **for us.**
15   Q.  Was there a company called Crown that did?
16   **A.  No, not that I'm aware of.  I don't think so.**
17   Q.  With respect to the other companies that
18 performed sales and marketing functions for ABC Debt
19 Relief, did they perform similar functions that ABC
20 Debt Relief performed?
21   **A.  Yes.**
22   Q.  What marketing services did ABC Debt Relief
23 perform -- I may refer to ABC Debt Relief as ABC.
24   **A.  Sure, no problem.**
25   Q.  What sales and marketing services did ABC

14

1  perform for Lloyd Ward & Associates?
2    **A.  Okay.  There were really -- and I'm going to**
3  **give you a long answer, because there is not a short**
4  **answer to this.  The long answer is they targeted**
5  **people specifically with credit card debt that would**
6  **need legal representation to attempt to reduce the**
7  **debt.  They used general marketing and advertising**
8  **under Google and Yahoo.  And, again, all ads had to be**
9  **approved by the Texas State Bar, which they were.  And**
10 **they also did direct mail, I believe, and they also**
11 **purchased leads.**
12   Q.  So when you say that they did general
13 marketing through Google and Yahoo, is that another way
14 of saying they had a Web site?
15   **A.  I'm an IT idiot, so I'm not sure whether you**
16 **would call it a Web site, but it's where they advertise**
17 **and you go to it and click on it and it reroutes it**
18 **down to the sales department, for lack of a better**
19 **term.  So I'm not sure if that's Web site or not.**
20   Q.  But it was approved by the Texas State Bar?
21   **A.  Uh-huh.**
22   Q.  Did you send it to the Texas State Bar?
23   **A.  We sure did.**
24   Q.  Do you still have the correspondence that you
25 sent to the Texas State Bar?

15

1    **A.  I would doubt it.  There was no reason to**
2  **keep it.**
3    Q.  Do you have the Texas State Bar's response to
4  you approving it?
5    **A.  No.  Again, we didn't keep that.  We didn't**
6  **see a need for it.**
7    Q.  But if I -- assuming the Texas State Bar
8  keeps things like that, if I were to go to the Texas
9  State Bar and ask for ads that were sent in, I would
10 ask for ads that were sent in by Lloyd Ward &
11 Associates, right?
12   **A.  Either Lloyd Ward & Associates or Lloyd Ward,**
13 **PC, one of the two, yes.  But it would be under one of**
14 **those two.**
15   Q.  All right.  And is it your understanding that
16 what you submitted to the State Bar is the same as what
17 somebody would find on Google and Yahoo?
18   **A.  That's my understanding.**
19   Q.  Okay.  All right.  And if someone went to
20 Google and Yahoo at that time and was looking for a
21 debt settlement company is it your understanding that
22 what they would have found would have been ABC Debt
23 Relief, or would they have found Lloyd Ward &
24 Associates?
25   **A.  They'd find Lloyd Ward & Associates.**

16

1    Q.  In other words, they would have found your
2  law firm?
3    **A.  Absolutely.  Otherwise marketing does me no**
4  **good.**
5      **(Exhibit 1 marked)**
6    Q.  (By Mr. Wood) I'm going to show you what I've
7  marked as Exhibit 1, and I'm going to represent to you
8  these are some pages that were pulled from your Web
9  site that talk about debt settlement.
10        And the question for you -- well, first
11 of all, can you confirm that that is what that is, that
12 those are pages from your Web site?
13   **A.  This one, I don't necessarily recognize.**
14   Q.  The first page?
15   **A.  Yes.  This one -- I recognize these.  And I'm**
16 **not saying it's not there.  I don't recognize it, but**
17 **it's entirely possible that it was, sure.**
18   Q.  Okay.  So other than the first page of that
19 exhibit, the rest of the pages look like they're from
20 your Web site?
21   **A.  Yes.  And can I -- would you like an**
22 **explanation.**
23   Q.  Sure.
24   **A.  One of the things, and as part of what our**
25 **marketing does, is when you use Google and you use**

**LLOYD WARD**
**July 6, 2011**

17

1  Yahoo, you have these mystical, magical words and it's
2  whatever the search terms are.  So the reason I say
3  that is because every six weeks, the marketing
4  department goes in and updates and makes changes in the
5  Web pages to make sure that whatever these mystical,
6  magical words are, are in your advertisement.  So that
7  when people do their search and words pop up, it will
8  help send them to our Web site.  So that's the reason I
9  say it very well may be and I don't know.
10     Q.  Okay.  And so in other words, during the time
11  that Onorato was at ABC, your Web site wouldn't have
12  been the same as it is now, but it might have been
13  similar in the sense that it would talk about that
14  subject, right?
15     A.  I believe so, yes.
16     Q.  Okay.  When I asked you what sales and
17  marketing functions ABC provided for Lloyd Ward &
18  Associates, you started off by saying that ABC targeted
19  people with credit card debt who might need debt
20  settlement services.  And then you went on to talk
21  about marketing through Google and Yahoo.  You talked
22  about direct mail and you talked about purchasing of
23  leads.
24         Are those all of the ways that you can
25  recall that ABC performed -- provided sales and

18

1  marketing functions for Lloyd Ward & Associates?
2     A.  There may have been, but those are the ones
3  that I'm most aware of.
4     Q.  The direct mail that ABC sent out, was
5  that -- was that information that also was approved by
6  the State Bar?
7     A.  I don't think it was approved by the State
8  Bar.  My understanding was that they just -- they took
9  a copy, if you will, of our Web page and that was what
10  was really put on the flyer to send out.
11     Q.  A copy of Lloyd Ward & Associates' Web page?
12     A.  Well, one of the Lloyd Ward & Associates Web
13  page, yes.
14     Q.  Did ABC Debt Relief even have a Web site?
15     A.  I don't know.
16     Q.  All right.  Do you know how ABC Debt Relief
17  would determine which people to send the flyers to?
18     A.  No.  That's all marketing company.  I mean,
19  don't take this wrong, but they've got their magical
20  formulas or, you know, based upon residence, based upon
21  income.  I mean, you buy those geographic maps that
22  tell you that this is a better region to send mailers
23  to than that is, et cetera.  That's all part of that
24  marketing stuff that you buy.
25     Q.  Do you know whether they would mail flyers to

19

1  the people who were on the lead lists that they had
2  purchased?
3     A.  I don't know.  I didn't assume they did, but
4  I never asked them.
5     Q.  You said they purchased leads.  Do you know
6  from whom they purchased the leads?
7     A.  There were several different entities.  And,
8  again, I've met the people that, quote, unquote, were
9  sellers of the leads, but I couldn't tell you any names
10  of companies.  Again, that was part of what I
11  contracted with them for.
12     Q.  Do you know what criteria they were -- what
13  type of person were they looking for when they
14  purchased the leads?  Do you know that?
15     A.  I have a general understanding, and this is
16  my understanding.  One is that most of leads are
17  generated -- for example, if you ever stayed up late at
18  night, they used to have those television ads, we can
19  reduce your debt by 70 percent, et cetera.
20         The companies that actually put those
21  ads out were not actually debt settlement companies or
22  attorneys or anybody else.  They were lead generators.
23  And people would call in and say I'm interested in the
24  program, please have somebody call me back, or they
25  would fill the form out, or whatever the case may be.

20

1  Then we would, then, buy those leads because that way
2  it's not a cold call.  That's somebody that's asked
3  that you call them back on that.
4         And the way that almost all leads
5  companies work is -- I found out -- what I call
6  stratified.  And that is you get some portion which are
7  basically good leads based on the criteria.  And you
8  get a whole bunch of them that are maybe leads, and
9  then you got the bottom criteria, which are -- you
10  know, they called in, but they're probably not going to
11  be a good lead.  And there were criteria that they --
12  once you got the leads and you had to take a look at if
13  they don't have a job.  They don't have a job to make
14  payments back.  They don't have a bank account.  If
15  they don't have a bank account, they can't make
16  payments for debt services anyway.
17         You know, I mean, there were certain
18  criteria that you looked at in the leads to determine
19  whether or not they were good  leads.  And all of those
20  lead companies stratified, because if they just tried
21  to sell the junk, it will never sell.  So they stratify
22  them when they sell them.
23     Q.  Do you have any idea what percentage of
24  Americans would meet the criteria that would make them
25  a good lead?

**LLOYD WARD**
**July 6, 2011**

21

1    A. No idea at all.
2    Q. Were you able to tell from leads how much
3  debt these people have?
4    A. I think that is one of the criteria they
5  looked at. That's the one reason I say they
6  stratified, again, who to call and who not to call. I
7  believe that to be the case.
8    Q. If someone did a Google or Yahoo search and
9  found Lloyd Ward & Associates that way and then they
10 called -- I assume this was a number for them to call,
11 right?
12   A. Correct.
13   Q. And if they called the number, would that
14 take them to an ABC employee?
15   A. Yes, it would.
16   Q. Someone like Chris Onorato?
17   A. Yes.
18   Q. And do you know what Mr. Onorato's title was?
19   A. No idea.
20   Q. Okay. Do you know what type of employee he
21 was?
22   A. I'm taking, based upon information I've
23 gathered since the filing, that he was commission only.
24 I didn't know prior to the suit, but after the suit was
25 filed, I'm assuming based on everything I've seen.

22

1    Q. Something like a debt consultant or --
2    A. Something like that. The nomenclature
3  changes periodically.
4    Q. All right. He would be the person to
5  speak -- who would be the person who would initially
6  speak with the customer, right?
7    A. I believe that's correct.
8    Q. All right. And part of what he would do
9  would be to assess whether that person was a candidate
10 for debt settlement, right?
11   A. I would assume so. I haven't seen his job
12 description, but I would assume that to be accurate.
13   Q. Do you know generally what types of employees
14 ABC had?
15   A. I know there were three -- okay. I know that
16 ABC had one set of employees and Lloyd Ward group had
17 two sets of employees. They handled the sales and
18 marketing which was the front-end sales and marketing.
19 Once they had approved somebody and said, yeah, this
20 guy is a good candidate, we think he's in the program,
21 he's agreed to join the program, I then had what we
22 called quality assurance.
23    Again, the nomenclature changes, but
24 their job was simply to, one, contact that person,
25 verify that they gave correct information -- because

23

1  you can't promise people that you're going to settle
2  their debt for 15 cents on the dollar -- and basically
3  outline what we can and can't do. And make sure that,
4  one, the person that said, yeah, we want to join the
5  program has been given the correct information.
6         And then, two, if they have been given
7  the correct information and they still want to join the
8  program, to go ahead and get them signed up. And then
9  the third set of employees were the people that
10 actually worked between the debtors and the creditors
11 to get the debt settled.
12   Q. So Mr. Onorato was one of the sales and
13 marketing employees?
14   A. Yes, sir.
15   Q. He was the one who had the initial call with
16 the client and made the initial determination that they
17 were qualified for the program, right?
18   A. I believe that's correct, yes.
19   Q. And he also initially got them to say they
20 were interested, right?
21   A. That may be a little broad, but I think it's
22 accurate.
23   Q. And then you're saying the second type of
24 employee, which I believe you called the quality
25 assurance group, would determine the accuracy of what

24

1  Mr. Onorato had determined?
2    A. Well, not just that, but make sure that there
3  hadn't been any misrepresentations by the sales staff,
4  because, obviously, some sales and marketing, since
5  they're on commission only, we want to make sure that
6  they weren't telling people things which weren't
7  accurate and which weren't deliverable.
8    Q. And that quality assurance group, were they
9  employees of ABC or employees of Lloyd Ward &
10 Associates?
11   A. Lloyd Ward & Associates.
12   Q. Were they -- at the time Lloyd Ward &
13 Associates and ABC were located in the same building,
14 correct?
15   A. Yeah, they're on the 8th floor.
16   Q. ABC was on the 8th floor and Lloyd Ward &
17 Associates was on the 10th floor?
18   A. That's correct. When we first started
19 actually, I was still out on Dallas Parkway, and it was
20 by accident I ended up here. I came over to visit one
21 day. Our lease was up at the old building and I went
22 to see the manager. This beautiful facility had been
23 vacated.
24   Q. And when you -- when ABC and Lloyd Ward &
25 Associates were both in the same building, the sales

**LLOYD WARD**
**July 6, 2011**

25

1   and marketing employees like Mr. Onorato were located
2   on the 8th floor, right?
3       A.  I believe that's correct, yes.
4       Q.  And they were located in an office that said
5   ABC Debt Relief on the door?
6       A.  I believe so, yes.
7       Q.  And the quality assurance group, where were
8   they located?
9       **A.  They were actually located -- when you walked**
10  **in, it all ends up being one large space.  I mean,**
11  **there's obviously an opening like a door and so you go**
12  **into the next space.  So when you went in -- the**
13  **quality assurance and the debt settlement people, when**
14  **you walked in, I believe you walked through the door**
15  **and you went through the doorway to the right and**
16  **that's where they were located.  And the sales staff**
17  **was ahead and you'd go through -- and it was actually**
18  **open when you walked in to the left.  So they were**
19  **segregated, but it wasn't walled in.**
20      Q.  So quality assurance group was located on
21  the 8th floor as well?
22      A.  Yes.
23      Q.  But you're saying that despite the fact that
24  the quality assurance group was located on the 8th
25  floor, those people were actually employed by Lloyd

26

1   Ward & Associates?
2       A.  Yes, sir.
3       Q.  The sales and marketing employees, like
4   Mr. Onorato, were paid by ABC, correct?
5       A.  Yes.
6       Q.  That's what their paycheck said?
7       A.  Yes.
8       Q.  Were the quality assurance group employees
9   paid by Lloyd Ward & Associates?
10      **A.  I think they're paid -- I think all paychecks**
11  **came through ADP.  We use ADP for all the payroll.  We**
12  **use ADP up here as well.  And I think that they were**
13  **under the Lloyd Ward & Associates group.**
14      Q.  You believe that the quality assurance group
15  employees were given paychecks that said Lloyd Ward &
16  Associates?
17      **A.  I think so.  I never looked at their**
18  **paychecks.**
19      Q.  Just roughly, how many quality assurance
20  group employees were there?
21      **A.  I'm going to say somewhere around 15.**
22      Q.  Do you know what their exact job titles were?
23      **A.  No.  But I know what their job duties and**
24  **descriptions were.**
25      Q.  If those employees were paid by Lloyd Ward &

27

1   Associates, you would have -- your law firm would have
2   a record of that, correct?
3       **A.  Through ADP.**
4       Q.  Your law firm would be able to get copies of
5   the checks that were made payable to those employees,
6   right?
7       **A.  If it came through us, yes.  We would just**
8   **request it from ADP and they would give us a printout.**
9   **Actually they would send you a CD.  And they may have**
10  **been paid through -- they may have been paid through**
11  **ABC.  I think it was Lloyd Ward, but it may have been**
12  **ABC.**
13      Q.  Well, if they were paid by ABC, would it
14  still be your contention that they were actually
15  employed by Lloyd Ward & Associates?
16      **A.  Oh, absolutely.**
17      Q.  And why would you say that?
18      **A.  Because I had an employee leasing program set**
19  **up with ABC to perform all HR and payroll functions.**
20      Q.  Were there documents that memorialized that
21  arrangement?
22      **A.  Yes.**
23      Q.  What were those documents?
24      **A.  It was an employee leasing program.**
25      Q.  Do you have a copy of that?

28

1       **A.  Yes.**
2       Q.  And it says that the quality assurance group
3   were those -- that those employees were employed by
4   Lloyd Ward & Associates but they were leased to ABC?
5       **A.  Yes.  We copied the -- there's three**
6   **different leasing companies out there.  ADP has an**
7   **employee leasing program -- I think there's three.**
8   **There's CDI and there's another company.  And so what I**
9   **did was I took their employee leasing program forms**
10  **that they use and combined them, plagiarized them.**
11      Q.  Did ABC pay Lloyd Ward & Associates a fee for
12  those leased employees?
13      **A.  No.  They were reimbursed any cost and**
14  **expenses, because, again, that was a direct cost for**
15  **Lloyd Ward & Associates.  So to the extent it was an**
16  **employee leasing program, they were paid through ABD --**
17  **I mean ADP, and I'm not sure which way the paycheck**
18  **showed on that.**
19      Q.  The quality assurance group employees, who
20  did they answer to?
21      **A.  Ultimately, they answer to me.**
22      Q.  But the sales and marketing employees, like
23  Mr. Onorato, do not answer to you?  Is that what
24  you're saying?
25      **A.  Yes.**

**LLOYD WARD**
**July 6, 2011**

29

1    Q.  They didn't?
2    A.  No.
3    Q.  Who did they answer to?
4    A.  You'd have to ask ABC.  And I know ultimately
5    it was Kevin or Lloyd.  I think Kervin was their
6    immediate superior.
7    Q.  Who is Kervin?
8    A.  He was an employee of ABC.
9    Q.  The quality assurance group that you say
10   ultimately answered to you, was there somebody within
11   ABC that they answered to before they answered to you?
12   A.  No.  I mean, ABC, obviously, oversaw them
13   through the employee leasing program, but ultimately --
14   and I'm trying to think.  It was -- my mind is drawing
15   a blank.  I'm sorry.  Anyway, no.  There were one to
16   two people downstairs that I would stay in constant
17   contact with and they would oversee and make sure the
18   employees did what they were supposed to do.  That's
19   the reason I say ultimately I didn't go down and
20   conduct day-to-day.
21   Q.  And then the third -- well, let me ask you a
22   question before we get to the third group of employees.
23        The sales and marketing functions that
24   ABC provided for Lloyd Ward & Associates, how did ABC
25   get reimbursed for those functions?

30

1    A.  ABC, in regard to those functions, one, was
2    reimbursed direct costs, which would be their --
3    whatever they paid for the -- for their advertising
4    expenses.  They were guaranteed a salary and then they
5    were paid a guaranteed salary of half a million dollars
6    a year.
7    Q.  Who was?
8    A.  ABC.
9    Q.  You mean the company?
10   A.  The company.
11   Q.  So Lloyd Ward & Associates paid ABC a half a
12   million dollars a year?
13   A.  Oh, absolutely.
14   Q.  Plus their costs?
15   A.  Plus their costs.
16   Q.  So just so I understand, ABC provides sales
17   and marketing services for Lloyd Ward & Associates,
18   and, in exchange, Lloyd Ward & Associates pays ABC a
19   salary of half a million per year and reimburses ABC
20   for all of its costs?
21   A.  Oh, absolutely.
22   Q.  That how it works?
23   A.  Absolutely.
24   Q.  So ABC's client was Lloyd Ward & Associates?
25   A.  Yes.  I wasn't their only client, but by and

31

1    far their biggest client.
2    Q.  So there were other -- were there other law
3    firms that ABC worked with?
4    A.  Yes.  Simon & Boksch out of California -- I'm
5    sorry -- out of Florida.  They worked with Legal
6    Helpers out of California, so yes.
7    Q.  Did ABC have similar arrangements with those
8    firms?
9    A.  I don't have any idea.
10   Q.  Is it your understanding that the only
11   clients that ABC had were law firms?
12   A.  ABC, yes.
13   Q.  And then we talked about the third group of
14   employees who you said worked with creditors.
15   A.  Yes.
16   Q.  Do you know what those employees were called?
17   A.  Well, they're paralegals.
18   Q.  They are law firm paralegals?
19   A.  Uh-huh.
20   Q.  Paralegals of Lloyd Ward & Associates?
21   A.  That's right.  They're back in the back
22   corner over here.  I've got 12 --
23   Q.  Still have --
24   A.  -- 15.  Oh, yes.
25   Q.  Twelve to 15 today?

32

1    A.  Oh, yeah.  And they're -- if you go to my
2    office and go left, they're all back over there.
3    Q.  They are the ones who negotiate the debt?
4    A.  Yes.
5    Q.  Were there any people located on the 8th
6    floor who negotiated the debt?
7    A.  I don't think so.  I'm not going to swear to
8    it, but I don't think so because we took all the
9    additional space up here and moved them up here for
10   that specific purpose.
11   Q.  When the paralegals negotiate the debt, do
12   you ever personally have to get involved?
13   A.  Oh, yeah.  Not often but occasionally.  And
14   when you say I, usually it's Sarah.
15   Q.  Sarah is one of your other attorneys?
16   A.  Yes, sir.
17   Q.  How many attorneys do you have here?
18   A.  Well, I just found out one of them is
19   leaving.  So currently I have myself, I have Charlie
20   Steadham, I have Sarah.  And Eugene was just let go.
21   I'm currently interviewing for a replacement for him.
22   I've also got Jason Malmburg here.  And Charlie
23   Steadham, the attorney that's been handling my SEC
24   work, has just told me that his mother is ill and he is
25   moving to, I want to say, Ohio.  So, anyway, come

**LLOYD WARD**
**July 6, 2011**

33

1   August 1, I'm going to have to find a new SEC attorney.
2   Q.   Would the paralegals ever negotiate the debt
3   for a person without the input or approval of an
4   attorney?
5   A.   Yes and no.  I'm really not trying to
6   bifurcate with you, but we give them guidelines of what
7   they can and can't do.  And provided they operate
8   within the guidelines, they don't have to come back
9   with every settlement.  So as long as they're
10  operating within the purview of the guidelines, then
11  the answer is no.  That's the reason I say occasionally
12  there is something that is exceptional that happens
13  that they need and come and consult with us and we get
14  directly involved with it.
15  Q.   So there are guidelines that the paralegals
16  have that were sufficiently well defined so that in
17  many cases they would -- they could negotiate a debt
18  without having to get the approval of one of the
19  attorneys?
20  A.   Yes.
21  Q.   And is it also the case that when a sales and
22  marketing employee, like Mr. Onorato, was initially
23  talking with a potential client that Mr. Onorato was
24  given guidelines that would enable him to determine
25  whether the person could be a client?

34

1   A.   I would assume so.  And, again, you'll have
2   to ask ABC.  But I would assume that, yes.
3   Q.   So to the best of your knowledge, a sales and
4   marketing employee, like Mr. Onorato, would not have
5   sought advice from one of Lloyd Ward & Associates
6   attorneys or paralegals at that initial stage?
7   A.   They might have.  And, again, typically the
8   answer is no, but occasionally the answer would be yes.
9   Q.   You're saying it might have happened or it
10  did happen?
11  A.   I don't recall a specific instance, but I'm
12  saying it might well have happened because, again, I
13  had Kyle Harneck, who was working with the paralegals,
14  and then I had Sarah.  So I'm not saying it didn't
15  happen, but I'm going to say, you know, we gave
16  regular -- I wouldn't say regular.  We gave irregular
17  seminars on the dos and the don'ts to the employees
18  under the Federal Fair Collection Practices Act to make
19  sure that ABC's employees knew that, Listen, guys
20  here's some things you can't do.  It's illegal to do
21  them.  Which much like Four Machinery, we go over there
22  regularly and talk to them about the OSHA guidelines so
23  that you make sure you keep your clients' employees
24  cognizant of what the rules and regs are.  It's an
25  ounce of prevention, pound of cure theory.

35

1   Q.   Would those seminars take place in your law
2   firm office?
3   A.   No.  I would go downstairs.  Or with Silver
4   Leaf, I would go to Silver Leaf's office, or with Four
5   Machinery, I'd go out to Four Machinery's office.
6   Employers always want you to come to their office and
7   they've always got their own dog and pony show that
8   they put on.  And then we put on, essentially, Hey,
9   listen guys, here's what the rules are.  Make sure
10  you're complying with them.  If you have any questions,
11  our law firm is always available.
12  Q.   When you say you went downstairs, you mean
13  you personally went to ABC's office to put on a
14  seminar?
15  A.   Yeah, several times.
16  Q.   When you put on those seminars would you tell
17  the ABC sales and marketing employees, such as
18  Mr. Onorato, what criteria a person would have to have
19  to be eligible for debt settlement?
20  A.   No.
21  Q.   How would they know that?
22  A.   That's -- you're going to have to --
23  internally ABC would have to determine that.  Because,
24  again, that's part of what I hired them for.  Our
25  criteria was just here is what the rules and regs are

36

1   in the Fair Debt Collection Practices Act or the Fair
2   Debt Credit Reporting Act, and here's what you can and
3   you can't do and here's what the creditor can and can't
4   do.
5   Q.   Well, do those rules and regulations specify
6   what a person's credit situation had to be in order to
7   be eligible for debt settlement?
8   A.   No.
9   Q.   So there wasn't a minimum amount of debt that
10  a person had to have to be eligible for it?
11  A.   I don't know.  I know what the average is,
12  but I don't know if that's what the criteria was.
13  Q.   When a person signed up for the debt
14  settlement -- when a person signed up for debt
15  settlement, did they become a client of Lloyd Ward &
16  Associates?
17  A.   After the quality assurance, then, at that
18  point in time, we would send the documentation out for
19  them to review and sign.  If they reviewed and signed
20  it, yes.
21  Q.   And you would consider at that point that
22  they had an attorney/client relationship with your law
23  firm?
24  A.   After they signed the documents, yes.
25  Q.   And the document would say that, right?

37

1      A.  Oh, yes.  It was an attorney retainer
2  agreement.
3      Q.  How did Lloyd Ward & Associates get paid by
4  the client?
5      A.  Prior to October 27, it was an up-front fee.
6  I mean, an up-front fee would be based upon the total
7  amount of indebtedness that they had.  And we started
8  at 15 percent and I think it may have dropped to
9  10 percent somewhere through the program.  And it may
10  have well stayed at 15 percent, so let's just make a
11  number up.  If they owed $100,000 in credit card debt,
12  our fee would be $15,000 paid over anywhere from three
13  to six months depending on the schedule.  And then
14  there is a monthly what we call a maintenance fee which
15  I want to say it was about $30 a month while they were
16  in the program.
17      Q.  And that was all money to the law firm, not
18  to ABC, correct?
19      A.  Correct.
20      Q.  The only time that money changed hands
21  between ABC and Lloyd Ward & Associates was when Lloyd
22  Ward & Associates would pay ABC a half a million
23  dollars salary plus cost reimbursement, right?
24      A.  Right.  That was done on a monthly basis.
25      Q.  Was there actually -- I know you mentioned

38

1  earlier that was an employee leasing arrangement
2  between Lloyd Ward & Associates and ABC and that there
3  would be documentation for that.  But other than that,
4  were there contracts that existed between Lloyd Ward &
5  Associates and ABC?
6      A.  We only had two contracts, a sales and
7  marketing agreement and an employee leasing agreement.
8      Q.  Do you have a copy of the sales and marketing
9  agreement?
10      A.  Yes.
11      Q.  Just to the best of your knowledge, what does
12  it say?
13      A.  To the best of my knowledge, the way that
14  it's set out is that it defines the way that the
15  marketing has to be done because it can't be
16  solicitation.  So we would make sure that when they did
17  the sales and marketing that there was no solicitation
18  involved.  We made sure that they were required to
19  comply with all the federal and the state bar rules --
20  the ABA rules as well as the state bar rules.  It,
21  then, provided a salary, and it also gave the
22  opportunity for them to make what I call a performance
23  bonus based upon their performance, quite frankly.
24      Q.  Is that a document that you could easily put
25  your hands on?

39

1      A.  Yes.
2      Q.  If we took a break, could you get us a copy
3  so we can just mark that as an exhibit to your
4  deposition?
5      A.  I'm not inclined to do that because before I
6  do that I want to consult with my client on that.  I'm
7  not keen about turning documents over without
8  consulting with clients first.
9      Q.  Has there ever been an attorney/client
10  relationship between ABC and Lloyd Ward & Associates?
11      A.  Yes.
12      Q.  Since when?
13      A.  Early '10.
14      Q.  What was it that caused there to be an
15  attorney/client relationship?
16      A.  Various matters.  When there would be people
17  who you would file bankruptcy and they would file an
18  adversarial in the bankruptcy against -- and they
19  inevitably named my law firm and also ABC.  And anytime
20  that -- as a matter of fact, I think there's two cases
21  or one case in Ohio right now of that ilk.
22          So they're inevitably claims filed in
23  regard to people who want reimbursement for fees that
24  have been paid, and they inevitably add ABC under the
25  allegations regarding marketing and sales.  Short term

40

1  is if a suit comes in and ABC is being sued, then as a
2  matter of both function and courtesy, we either act as
3  local counsel -- because obviously we're not licensed
4  in Ohio, so we actually hire the Ohio counsel -- and
5  oversee the litigation with them.
6          We had one in Florida, and, again, we
7  hired local counsel.  We oversaw the litigation with
8  them.  I think I've got -- we have had a couple in
9  Texas which we directly handled litigation for.  So
10  anytime litigation comes up involving them in
11  conjunction with their sales and marketing for our
12  services, we handle it.  And we charge them, but we --
13  we handle it.
14      Q.  Why was it important to you to have the sales
15  and marketing folks be employed by ABC but the other
16  two types of employees be employed by the law firm?
17      A.  That was advice that came through -- when we
18  originally approached this idea, Phil Offill, who was
19  the former compliance attorney for the SEC over in Fort
20  Worth, looked at this and evaluated it.  Robby
21  Birnbaum, who is an attorney out of Florida, who is
22  head of the task and is, quote, unquote, the authority
23  on debt.  So companies looked at it.  I had I want to
24  say Chris Wheel here locally look at it.
25          But I've had several attorneys look at

**LLOYD WARD**
**July 6, 2011**

41

1    it, and they helped formulate both the actual contract
2    as well as how are we able to sell, market and do this
3    and at the same time comply with the federal and state
4    rules. And I believe it was Robby Birnbaum that said
5    you need to have the sales and marketing completely
6    separated out of it. It's a matter of function in
7    order to make sure you're in compliance with both
8    federal and state rules.
9        Q.  Do you know when ABC began doing business?
10       A.  October, that I know of.  Before that, I'm
11   not sure.
12       Q.  October of what year?
13       A.  Of '09.
14       Q.  When did ABC -- strike that.
15           On what occasions did ABC use Lloyd Ward
16   & Associates' conference room?
17       A.  Anytime they wanted.  All of my clients have
18   free access to my conference room.  Anytime that my
19   clients want to use the conference room as a service,
20   we say come up and use it.  Because the more the
21   clients come to the office, the more they use the
22   facilities, the more they become intimate with us, the
23   longer term those clients tend to be.
24       Q.  Did ABC have management meetings in your --
25   in Lloyd Ward & Associates' conference room?

42

1        A.  I'm sure they did.  I would come by on
2    several occasions and see them up here.  All they have
3    to do is call and visit with Blanca and block out a
4    time they want to use the conference room and they're
5    welcome to it.
6        Q.  Did you ever participate in those management
7    meetings?
8        A.  No.  I would usually walk through and say
9    hello to everybody.  I believe that you should be
10   friendly with everybody.  If you're working with people
11   or they're working with you, I've always found that, as
12   my grandfather said, honey draws more flies than
13   vinegar does.
14       Q.  And Lloyd Ward and Associates debt settlement
15   clients would meet in the conference room, correct?
16       A.  If they wanted to, yes.
17       Q.  And I think you've answered this before, but
18   it was told to the clients that they were clients of
19   the law firm, right?
20       A.  That's right.
21       Q.  And that the law firm would do the debt
22   settlement work?
23       A.  That's correct.
24           MR. WOOD:  You want to take a break?
25           MR. WARD:  Okay.

43

1        (Recess taken, 10:11 to 10:25)
2        Q.  (By Mr. Wood) You said that ABC began doing
3    business in October 2009?
4        A.  No.  That's when I started doing business
5    with ABC.  Now, if they existed before that, I don't
6    know.
7        Q.  Before that time, had Lloyd Ward & Associates
8    done business with any other sales and marketing
9    companies similar to ABC?
10       A.  Yes.
11       Q.  Silver Leaf?
12       A.  Silver Leaf.
13       Q.  When did you start doing business with Silver
14   Leaf?
15       A.  May of '09.
16       Q.  Anybody before then?
17       A.  Not -- okay.  Not in the exact same format
18   but in similar formats, yes.
19       Q.  You said earlier that Lloyd Ward & Associates
20   has been in the debt settlement business, I believe,
21   for 15 or 20 years.
22       A.  Yes.
23       Q.  Was Lloyd Ward & Associates busier in that
24   area, say, in 2010 than it had been in 2008?
25       A.  Substantially.

44

1        Q.  All right.  Tell me again when Lloyd Ward &
2    Associates changed offices to this Central Expressway
3    location.
4        A.  February of '10, I believe.
5        Q.  You said a while ago that in 2010 Lloyd Ward
6    & Associates was substantially busier in the debt
7    settlement area than it has been in 2008.
8        A.  Yes.
9        Q.  In January of 2010, before your office moved,
10   was Lloyd Ward & Associates very busy in the debt
11   settlement area?
12       A.  Yes.
13       Q.  And can you quantify that for me?  I mean,
14   how many -- just ballpark how many clients did you have
15   then in that --
16       A.  That's why I'm thinking that because it
17   really started in November of '09 when the business
18   started to pick up.  And we had started doing business
19   with Silver Leaf in October of '09.  We began doing
20   business with ABC on November of '09.  And it's like
21   all other types of business.  I mean, I would use the
22   term ramping up.  And that is, obviously, as the
23   marketing gets out, there's usually anywhere from a 30-
24   to 90-day lag in the time between your marketing starts
25   and any type of, I would say, substantial return on

45

1  those investments that you're making on that marketing.
2     Q.  Did Lloyd Ward & Associates have anything to
3  do with setting up either Silver Leaf or ABC?
4     A.  No.
5     Q.  Remind me where your location was before
6  Central Expressway.
7     A.  17850 North Dallas Parkway.
8     Q.  When you were at the North Dallas Parkway
9  location, how many paralegals did you have?
10    A.  When I was in that one, oh, man, we had
11  reduced staff substantially.  '07 into '08 was tough
12  for us.  We laid off four attorneys.  We got rid of
13  three paralegals.  I mean, at that point in time, I had
14  three paralegals and two attorneys.
15    Q.  Now you say that you have between 12 and 15
16  paralegals?
17    A.  Yes.
18    Q.  How many paralegals did you have in, let's
19  say, March of 2010?
20    A.  About that number, if I were guessing.
21    Q.  Does that mean that your debt settlement
22  business is now twice as busy as it was back then?
23    A.  No.  It's a combination of a number of
24  things.
25    Q.  Why were you able to get by with half as many

46

1  paralegals in March 2010 as you have now?
2     A.  Because prior to really the second quarter of
3  '07, our primary business was banks.  We had six banks
4  we represented.  We had 17 leasing companies.  I had
5  two large land developers and then I had a ton of small
6  construction companies, land developers.  That was, if
7  you will, kind of the backbone of the business.
8        And then during '07 and the first
9  quarter of '08, as people may have noticed, is what
10  they now call the banking crisis.  We lost 17 leasing
11  companies in a period of roughly a year.  I don't mean
12  they quit using us, I mean they went out of business.
13  We went from six banks to two banks because, as an
14  example, Abrams Centre Bank was acquired by Prosperity.
15  We were doing Century Bank, which was acquired by Wells
16  Fargo.
17        So what happened was that during that
18  time periods we are saw our clients literally
19  evaporate.  Beginning in the third quarter of '09, my
20  wife came up and was started marketing.  Before that
21  point in time, we had never had a Web site.  We didn't
22  carry a Yellow Pages ad.  The banking business, the
23  real estate business, people don't look in the Yellow
24  Pages.  It's strictly referral business.
25        And so my wife came up.  She is a

47

1  graduate of LSU with a degree in design and engineering
2  and worked with a gentleman named Mo Dakka and
3  developed our Web site.  Then during the '09 year, we
4  began doing print media ads with things like Dallas
5  Luxury Magazine.  We did some radio advertisements.
6  And so what happened was -- and also we diversified.  I
7  brought a gentleman in that would do SEC work.  I had
8  Cami Boyd, who recently relocated also with her
9  husband, who is a licensed IP attorney, copyright
10  attorney.
11        So what I did was I brought people on
12  board to expand the base.  So instead of us being
13  primarily  a litigation law firm, we starting doing
14  some SEC work, some IP work.  I brought a gentleman on
15  board that was tax related, so we expanded our base, if
16  you will.
17        And what then happened was beginning in
18  '09 and on through '10 and even today, it's just been
19  an expansion that's a fairly nice expansion.  We're
20  finally starting to pick the clients back up.  We're
21  about to do a deal with a couple of regional banks to
22  pick their work back up.  So to answer your question --
23  it's not did the debt settlement help -- absolutely.
24    Q.  Tell me again how many lawyers you have now.
25    A.  Right now, me, Jason, Sarah, Charlie.

48

1  There's four of us right now.
2     Q.  Okay.
3     A.  Three months ago, we had seven.
4     Q.  Mr. Ward, Jason, Sarah.  Who else?
5     A.  Charlie.
6     Q.  What kind of lawyer is Jason?
7     A.  Jason is actually handling our debt
8  collection business.
9     Q.  What kind of lawyer is Sarah?
10    A.  Sarah is handling our debt negotiation
11  business.
12    Q.  What kind of lawyer is Charlie?
13    A.  Charlie has been handling the SEC.  And
14  Charlie is headed, like I said, August 1.
15    Q.  You're a transactional lawyer?
16    A.  I'm whatever lawyer you need.
17    Q.  But two of your lawyers are focused solely on
18  the debt settlement part of your business, right?
19    A.  No.  Jason does nothing but debt collection.
20    Q.  Oh, debt collection.
21    A.  Yes, sir.
22    Q.  Okay.  So one of your lawyers is a debt
23  settlement lawyer?
24    A.  Uh-huh.
25    Q.  Yes?

**LLOYD WARD**
**July 6, 2011**

49

1      A.   Absolutely.
2      Q.   And out of your 12 to 15 paralegals, how many
3   of those paralegals do primarily debt settlement work?
4      A.   75 percent of them.
5      Q.   So 10 to 12 of them --
6      A.   Yes.
7      Q.   -- do primarily debt settlement work?
8      A.   Yeah, probably.
9      Q.   If that's the case, if you need 10 to 12
10  paralegals to do debt settlement work, why do you have
11  twice as many paralegals doing that work as you did
12  roughly a year ago?
13     A.   Because it's a learning experience. And what
14  I found out was -- excuse me -- especially with debt
15  settlement, there's a lot of hand holding involved.
16  They want to call and want to talk to people. They
17  want -- if they get a call from a creditor, they panic
18  and they want you to call them. They want to check in
19  on a regular basis to find out if you've talked with
20  any credit card companies.
21          I mean, it's much like what I say with
22  PI work or with divorce work, there seems to be a
23  substantially larger amount of hand holding that needs
24  to be done than it is with a typical client. Banks
25  don't need hand holding and real estate developers

50

1   don't need hand holding, but those clients do.
2      Q.   Do you have more debt settlement clients
3   today than you did in March 2010?
4      A.   I'd have to go back and look at the numbers.
5   I would say probably. I don't know it's a
6   substantially large number, but I would say probably.
7      Q.   When a paralegal negotiates with debt for a
8   client, I assume that there is some documentation that
9   has to be signed between somebody and the creditor,
10  right?
11     A.   Do you want to know how it works?
12     Q.   Let me ask you a different question.
13          Does there come a time where either the
14  paralegal or an attorney of this law firm has to sign a
15  piece of paper negotiating that debt?
16     A.   We have a settlement form that we use, okay,
17  if that answers your question. And it's a promulgated
18  settlement.
19     Q.   The parties to that form are the creditor,
20  the debtor, right?
21     A.   Correct.
22     Q.   Does your law firm sign off on it as well?
23     A.   Not typically.
24     Q.   All right. Was there ever a time when an
25  employee of ABC Debt Relief was doing the debt

51

1   negotiation?
2      A.   Not that I'm aware of. I'm not going to tell
3   you it didn't happen, but I'm going to tell you I'm not
4   aware of it.
5      Q.   Even when you were at the Dallas Parkway
6   location, it didn't happen; is that correct?
7      A.   Not that I'm aware of. As a matter of fact,
8   that location, I promulgated the employee lease.
9      Q.   How many paralegals -- you had three
10  paralegals at the Dallas Parkway location, right?
11     A.   That's right.
12     Q.   And that was enough paralegals to negotiate
13  the debts?
14     A.   No. So during that time period, they would
15  have had to have been at ABC. I mean --
16     Q.   Who would have been at ABC?
17     A.   The negotiators would had to have been
18  downstairs because we just didn't physically have the
19  room. That was the reason after the lease was up, we
20  had to move.
21     Q.   So ABC employees would have been negotiating
22  the debt?
23     A.   No. They would have been my employees, but
24  they would have been -- they would have had office
25  space on the 8th floor until we got moved over here. I

52

1   hadn't thought about it. Yeah, that would have to be
2   correct.
3      Q.   I want to go back. I asked you earlier
4   whether there was an attorney -- whether there ever was
5   an attorney/client relationship between ABC and Lloyd
6   Ward & Associates. And you said there had been some
7   occasions as early as 2010 where there had been a
8   relationship like that, correct?
9      A.   Correct.
10     Q.   And the example you gave was various matters
11  where a client is dissatisfied and sues somebody --
12  sues both of you potentially, right?
13     A.   Or this lawsuit.
14     Q.   Okay. So this lawsuit is an example of that?
15     A.   Yes.
16     Q.   When did your attorney/client relationship
17  with ABC begin with respect to Mr. Onorato?
18     A.   Never had one.
19     Q.   Until when?
20     A.   Never had one.
21     Q.   There is not an attorney/client relationship
22  right now between Lloyd Ward & Associates and ABC with
23  respect to this lawsuit?
24     A.   You said Mr. Onorato.
25     Q.   I'm sorry. I misspoke. Okay.

**LLOYD WARD**
**July 6, 2011**

53

1    When did your attorney/client
2 relation -- when did Lloyd Ward & Associates'
3 attorney/client relationship begin with ABC Debt Relief
4 with respect to Mr. Onorato?
5    A.  You mean this lawsuit?
6    Q.  No.  With respect to Mr. Onorato, period.  If
7 the answer is the lawsuit, that's fine.
8    A.  The lawsuit would have been the first
9 indication I had.  I had met Mr. Onorato, obviously,
10 coming in and out of the building when we went
11 downtown -- or when I would go downstairs, but I didn't
12 know anything about any issues until the lawsuit.
13    Q.  So when he filed -- when Mr. Onorato filed
14 his lawsuit, that's when the attorney/client
15 relationship started between Lloyd Ward & Associates
16 and ABC Debt Relief with respect to Mr. Onorato?
17    A.  Correct.
18    Q.  I believe you said this earlier, but ABC Debt
19 Relief paid Mr. Onorato, correct?
20    A.  I believe that's correct, yes.
21    Q.  Do you know what his dates of employment
22 were?
23    A.  No, sir, I don't.  I mean, I could go back
24 and pull the records we provided, but I couldn't tell
25 you off the top of my head.

54

1    Q.  Do you know how he was compensated?
2    A.  From what I've seen in the lawsuit, it was a
3 commission only basis.
4    Q.  Do you know whether he was a good performer?
5    A.  I'm assuming that he was.  I mean, I don't
6 have any specific knowledge.
7    Q.  Do you know how it would be measured as to
8 whether he was a good performer?
9    A.  You'd have to ask ABC.  I try not to
10 interfere with direct employee relationships with my
11 clients.
12    Q.  Were the sales and marketing employees of
13 Silver Leaf also -- those were employed by Silver Leaf,
14 correct?
15    A.  Yes.
16    Q.  Did you allow those employees to sign their
17 e-mails Lloyd Ward & Associates?
18    A.  Their e-mails, in order to differentiate, I
19 believe was under Lloyd Ward.  Just under Lloyd Ward,
20 but I'd have to go back.  I know we had a different
21 e-mail system from here from there so that we could
22 differentiate in regard to e-mails, who was sending
23 e-mails and who was receiving e-mails.
24    Q.  So Silver Leaf employees would sign e-mails
25 Lloyd Ward & Associates?

55

1    A.  They wouldn't sign e-mails.  They would be on
2 the system.  They would sign their e-mails with Silver
3 Leaf, but it would be -- we monitor.  We keep -- we
4 like to be able to monitor the e-mails.  So they would
5 have gone out, I think, just Lloyd Ward, but I'd have
6 to go back and check.
7    Q.  Why did Mr. Onorato sign his e-mails Chris
8 Onorato, attorneys at law, Lloyd Ward & Associates?  Do
9 you know why he would have done that?
10    A.  No.
11    (Exhibit 2 marked)
12    Q.  (By Mr. Wood) Let me show you what's marked as
13 Exhibit 2, and ask you if you've seen this document
14 before.
15    A.  I'm sure I've seen the document before.  I'm
16 assuming it's something that's been produced.  I didn't
17 think he was a debt analyst.  I was under the
18 assumption that he worked in the sales and marketing
19 department.  I honestly don't know, but assumed that he
20 might have been in either the quality assurance or he
21 may have been in the other, but I was assuming he was
22 in sales and marketing.  Now --
23    Q.  Well, let me ask you question about that.
24    A.  Sure.
25    Q.  So your belief is that if he had the title of

56

1 senior debt analyst, he was not a sales and marketing
2 employee?
3    A.  I don't know.  You will have to ask him.  I
4 was under the assumption he was in the sales and
5 marketing department.  That's what the document I've
6 seen shows, so I don't know why this was done this way
7 is the short answer.
8    Q.  Well, were senior debt analysts paid by Lloyd
9 Ward & Associates, or were they paid by ABC Debt
10 Relief?
11    A.  The answer to the question is the
12 paralegals/debt settlement end of it, the paralegals
13 were paid by me and the quality assurance are.  And,
14 again, I'm not -- I don't know what the nomenclature
15 downstairs is being used -- what job descriptions are.
16 I mean, I don't know.  I don't interfere with it.
17    Q.  Is it your belief that a sales -- is it your
18 belief that a senior debt analyst would fall under the
19 category of quality assurance rather than sales and
20 marketing?
21    A.  I don't know.
22    Q.  Who would know that?
23    A.  Mr. Devoto and Mr. Regner.  But from the
24 documents I've seen, he was in the sales and marketing
25 department because from the documents at least I recall

57

1 having seen he was paid through ABC and he was on
2 commission only which would put him in the sales and
3 marketing department.
4 Q. So that's the way to tell, right?
5 A. Yes.
6 Q. So it's possible, then, that he could have
7 had the title of senior debt analyst but also had been
8 in the sales and marketing department?
9 A. Apparently.
10 Q. All right. Well, do you know why he would
11 sign his e-mails senior debt analyst, attorneys at law,
12 Lloyd Ward & Associates?
13 A. You know, I think that's a bit of a
14 misstatement. But in all of our advertising companies
15 when they send their advertisements out, they send it
16 out under Lloyd Ward & Associates, otherwise they're
17 not a sales and marketing company from a law firm so...
18 Q. So you knew -- whether you knew specifically
19 that Mr. Onorato was doing this, you knew that the
20 employees of ABC would send out letters or would sign
21 e-mails stating their name, and then right below that
22 Lloyd Ward & Associates?
23 A. No. I haven't paid any attention. I didn't
24 know that's what they were doing. But I'm telling you
25 all of the marketing companies that we use, whether

58

1 it's Click 4 or any of them, when they send e-mails out
2 in regard to clients that contact them, it's different
3 formats, but it's very similar because they're
4 promoting my product. That's what they're paid to
5 promote. They're not promoting their product. So, you
6 know, my name is all over the thing because I'm paying
7 them to promote my product.
8 Q. Let me make sure I understand your testimony.
9 You're saying that if employees of ABC sent e-mails out
10 and underneath their name put Lloyd Ward & Associates,
11 you just had no knowledge of that?
12 A. No, but it doesn't surprise me.
13 Q. Well, did you ever get e-mails from employees
14 of ABC?
15 A. I would usually be copied on e-mails. But
16 the e-mails would go through the attorney here on our
17 staff that was handling the debt settlements, so I
18 mean -- would I get copied, yes, but they typically
19 aren't directed to me.
20 Q. If you look at the top of Exhibit 2, you'll
21 see that Mr. Onorato's e-mail address is
22 chriso@lloydwardlawfirm.com. Do you see that?
23 A. Yes.
24 Q. Did he have an e-mail address
25 chriso@lloydwardlawfirm.com?

59

1 A. Sure did.
2 Q. Did all of the ABC Debt Relief employees
3 have e-mail addresses with their name at
4 lloydwardlawfirm.com?
5 A. Sure did.
6 Q. So if you're someone on the outside world and
7 you're viewing that, you would take it, wouldn't you,
8 that this person is employed by the law firm?
9 A. Probably.
10 Q. He says in his e-mail here that -- he says in
11 the second sentence, Trying to figure out who you can
12 depend on in this business can be challenging. In the
13 past when I have had other potential clients who had
14 basically the same question, they felt better knowing
15 the following, Lloyd Ward & Associates attorneys at
16 law. Through our years of experience in many areas of
17 law, we have gained knowledge and wherewithal to
18 produce unmatched results in attorney negotiations for
19 clients for debt. In addition, we have an experienced
20 staff who provides the highest level of customer
21 support.
22       Is everything he said there about your
23 law firm accurate?
24 A. I like to think so.
25 Q. Then he says, in the first bullet point, The

60

1 premier attorney debt negotiation law firm in the U.S.
2 Is that accurate?
3 A. That may be fluffing a little, but...
4 Q. It's not demonstrably inaccurate, is it?
5 A. I like to think we're the best.
6 Q. All right. And then he says, In business
7 since 1985. Is that correct?
8 A. That's when I obtained my law license.
9 Q. Did you approve any of this language?
10 A. Did I approve it?
11 Q. Yes.
12 A. Personally no. My marketing department would
13 have had to look it over. So that's the reason I say
14 you'd have to visit with either my wife or Mo Dakka,
15 who handles our Click 4 business. But they all, if you
16 will, kind of put their heads together to figure out
17 what the best promotional material is.
18 Q. But if ABC employees were trying to convince
19 potential clients that they should use Lloyd Ward &
20 Associates as opposed to other debt settlement
21 companies because Lloyd Ward & Associates is a law firm
22 that's been in business since 1985 and it's one of the
23 premier debt negotiation law firms in the US, you
24 wouldn't have any problem with that, would you?
25 A. No.

**LLOYD WARD**
**July 6, 2011**

61

1    Q.  Do you know if they were, in fact, doing
2  that?
3       **A.  I'm assuming they are, or were.**
4    Q.  Did you at some point become aware of a
5  letter sent by Mr. Onorato's attorney to Lloyd Regner
6  and Kevin Devoto complaining about Mr. Onorato not
7  being paid properly and some other complaints that he
8  had?
9       **A.  Yes.**
10   Q.  How did you become aware of that?
11      **A.  After the lawsuit was filed, that was part of**
12  **the documentation that was brought to me.**
13         **(Exhibit 3 marked)**
14   Q.  (By Mr. Wood) Let me show you what I've marked
15  as Exhibit 3, and ask you if that is the letter that I
16  just referenced.
17      **A.  I believe it is.  I mean, I'm...**
18   Q.  You've seen that before?
19      **A.  That looks very familiar, yes.**
20   Q.  You wouldn't forget the picture, would you?
21      **A.  No, not necessarily.**
22   Q.  You believe you've seen this before?
23      **A.  I do.**
24   Q.  But you believe the first time you saw this
25  was after Mr. Onorato filed his lawsuit?

62

1       **A.  I believe that's when it was.  That was the**
2  **first time it was brought to my attention.**
3    Q.  And that's the first time you saw it?
4       **A.  I believe so, yes.**
5    Q.  And just to be clear, when we say the
6  lawsuit that Mr. Onorato filed, you're aware that
7  Mr. Onorato initially filed a collective action
8  lawsuit, right?
9       **A.  Correct.**
10   Q.  And that's the lawsuit you're referring to,
11  right?
12      **A.  Correct.**
13   Q.  You've read this letter, correct?
14      **A.  Yes, I have.**
15   Q.  And this is a letter in which Mr. Onorato's
16  attorney, Mr. Brannon, complains that Mr. Onorato
17  hasn't been paid overtime, right?
18      **A.  Yes.**
19   Q.  And he also complains that Mr. Onorato has
20  been harassed at work and that he was retaliated
21  against, correct?
22      **A.  Yes.**
23   Q.  Okay.  Did you ever discuss that letter with
24  either Lloyd Regner or Kevin Devoto?
25      **A.  Yes, I did.**

63

1    Q.  When was the first time you talked with them
2  about it?
3       **A.  It would have been sometime shortly after the**
4  **service of the citations in the suit.**
5    Q.  Do you consider those conversations to be
6  attorney/client privilege?
7       **A.  Yes, I do.**
8    Q.  So if I asked you what you said, you wouldn't
9  answer me, correct?
10      **A.  I wouldn't.**
11   Q.  Just for the record, I will ask you.
12         What was said that during those
13  conversations?
14         MR. WARD:  Objection, refuse to answer,
15  attorney/client privileged communications.
16         (Exhibit 4 marked)
17   Q.  (By Mr. Wood) Let me show you what I've marked
18  as Exhibit 4.  Have you ever seen this document before?
19      **A.  I don't have specific recollection, but I'm**
20  **sure I did.  I was CC'd on up here so I'm assuming I**
21  **received it.**
22   Q.  Is that your correct e-mail address?
23      **A.  Yes.**
24   Q.  Are you saying you don't recall receiving it,
25  or you don't recall reading it at the time it was sent

64

1  or around that time?
2       **A.  No.  I'm saying I don't have specific**
3  **recollection, but I'm sure I did.**
4    Q.  All right.  And you're just sure you did
5  because you open your e-mails and read them?
6       **A.  For the most part.**
7    Q.  All right.  Well, this e-mail is from Rick
8  Longo to Chris Onorato, right?
9       **A.  Correct.**
10   Q.  And it says in the first line, Per the
11  instruction of Mr. Lloyd Ward comes the following.  And
12  it goes on to say, You are to cease and desist any and
13  all contact with any employees of ABC Debt Relief or
14  the employees of Lloyd Ward & Associates while we
15  review the allegations of your threatened lawsuit.  Any
16  further contact with such employee shall be grounds for
17  termination for violation of company policy.  We will
18  have finished review of your allegations within the
19  statutory 15-day time period.  Thank you for your
20  cooperation.
21         Were those the instructions that you
22  gave?
23      **A.  I'm sure they were.  At that point in time,**
24  **it would been Kyle and -- not Sarah -- who would have**
25  **been overseeing this.  And when one of my associates**

**LLOYD WARD**
**July 6, 2011**

65

1　comes in, they'll usually give me an outline of what's
2　going on and they'll say what do you think we should do
3　and I'll make recommendations and they then relay them.
4　Indirectly, but I'm sure we did.
5　　　Q.　All right.  Do you know what Longo was
6　referring to when he talks about the statutory 15-day
7　time period?
8　　　A.　Not really, to be honest with you.
9　　　Q.　Okay.
10　　　A.　And again, the associates usually research
11　these and they come in and they give me information and
12　then I'll tell them what I think should be done and
13　they'll go back.  And so I'm sure that they looked it
14　up at the time.
15　　　Q.　All right.
16　　　　　MR. WARD:  Can we break just one second?
17　　　　　(Recess taken, 10:55 to 10:56)
18　　　　　(Exhibit 5 marked)
19　　　Q.　(By Mr. Wood) Let me show you what I've marked
20　as Exhibit 5, and ask you if you have seen this
21　document before.
22　　　A.　And, again, I'm sure I have.
23　　　Q.　Do you know whether you read it around the
24　time you received it?
25　　　A.　I don't have specific recollection, but I'm

66

1　sure I did.
2　　　　　(Exhibit 6 marked)
3　　　Q.　(By Mr. Wood) Let me show you what's marked as
4　Exhibit 6, and ask you if this is an e-mail that you
5　sent to Mr. Onorato's attorney, Trey Brannon.
6　　　A.　I don't specifically recall the letter, but I
7　like it.
8　　　Q.　You sent this?
9　　　A.　It's coming off of my e-mail, but this would
10　actually been drafted by Kyle Harneck, who was in our
11　office at that time.
12　　　Q.　How do you spell his last name?
13　　　A.　H-A-R-N-E-C-K.
14　　　Q.　He is an associate of yours?
15　　　A.　He was, yes.
16　　　Q.　Do you know when he graduated law school?
17　　　A.　Now I'm going to lie to you.  I think he's
18　been practicing almost three years now is my
19　recollection.
20　　　Q.　Almost three years now?
21　　　A.　Uh-huh.
22　　　Q.　So at the time, he was maybe a first- or
23　second-year lawyer?
24　　　A.　No.  This was a year ago, so he would have
25　been probably two years into it.  He had about two

67

1　years when I hired him.
2　　　Q.　So he was a two-year lawyer, right?
3　　　A.　Yes.
4　　　Q.　You're saying he may have drafted this
5　e-mail?
6　　　A.　I'm pretty sure he did.
7　　　Q.　And Mr. Harneck, a second-year lawyer -- or a
8　second-year associate with your firm had the authority
9　to send out e-mails on your behalf?
10　　　A.　Well, my guess is that he drafted this, sent
11　it to me for my review for me to make any editing and
12　then he forwarded it on out.
13　　　Q.　So you approved the e-mail before it was
14　sent?
15　　　A.　Yes.  It wouldn't have gone out under my
16　e-mail if I hadn't.
17　　　Q.　And this says that -- in the first paragraph,
18　it says, A full review of the client's pay history has
19　been done and your client has been paid the equivalent
20　of two and a one half wages which would been due to him
21　based on minimum wages, since his employment, based on
22　a 77-hour workweek.
23　　　　　So I take it from that, that what
24　you-all did was you looked at the number of hours he
25　worked for the week, which was 77, and you -- and then

68

1　you looked at his compensation and you did the math.
2　And you determined that based upon that, he had been
3　paid not only minimum wage but he had been paid an
4　appropriate amount for the hours that he worked over a
5　40-hour week?
6　　　A.　No.
7　　　Q.　What's wrong with that?  Did I misread the
8　sentence?
9　　　A.　No.
10　　　Q.　That's what the sentence suggests happened,
11　right?
12　　　A.　I don't think that's what the sentence
13　suggests and that's not what we did.
14　　　Q.　What did I get wrong about what this sentence
15　says?
16　　　A.　Here was part of the problem.  Part of the
17　problem was that there was not a consistent check-in
18　and check-out that was being done when we went back and
19　looked at the records.  I mean, sometimes they would
20　come in without checking in.  Sometimes they would
21　check in or not check out or check out and not check
22　in.  So what we attempted to do was go back and take a
23　look to see when people had logged onto the computer
24　because that was really the easiest way to do it.
25　　　　　And I was -- and, again, the

**LLOYD WARD**
**July 6, 2011**

69

1    determination was made that we didn't think there
2    was -- we just said if he worked an average of 10 hours
3    a day, 7 days a week, which I don't think it's
4    accurate. But even if you did that, if you worked 7
5    days a week, 10 hours a days, that's where we came up
6    with the hour numbers.
7        Q. That's only 70. That's 70, right?
8        A. Yes.
9        Q. So it would be 11 hours a day?
10       A. Eleven hours a day.
11       Q. Seven days per week?
12       A. Seven days per week.
13       Q. Right.
14       A. And then all we did was we, then, took the
15   compensation that was paid during that time period and
16   did simple mathematics on it.
17       Q. Well, how did you come up with a number of
18   77? I mean, I know you told me it's 11 times 7, but
19   how did you come up with that?
20       A. That was a number that Rick Longo had given
21   us on this when he went back and took a look at it.
22   And, I mean, Rick can explain it to you, but he said
23   that based upon whatever the criteria was at the time,
24   he didn't think he'd ever worked more than 11 hours in
25   any day. So even if we gave him the benefit of the

70

1    doubt of the most hours we think he would have worked,
2    and even if we sent it through seven days a week, that
3    that's what the numbers came out to be.
4        Q. All right. Does ABC have documents which
5    will accurately reflect the number of hours that
6    Mr. Onorato worked?
7        A. To the extent the documents exist, I believe
8    they have been produced.
9        Q. Mr. Longo would be better able to interpret
10   those than you?
11       A. Yes, sir.
12       Q. Mr. Onorato was suspended, correct?
13       A. Yes.
14       Q. So that an investigation could take place?
15       A. Yes.
16       Q. What did this investigation consist of?
17       A. The investigation consisted of two items.
18   One is they went back and they took a look at obviously
19   the pay hour issue. The other was the fact that
20   Mr. Onorato -- and I'm going to lie to you now -- but
21   the gentleman who had sent the e-mail that you had --
22   that had been attached to this letter, this
23   gentleman -- once this was brought to the attention,
24   then the gentleman who sent this was suspended for some
25   time period.

71

1        Q. Mr. McLain?
2        A. Uh-huh. Whoever sent this.
3        Q. All right.
4        A. Not by the same token, we found out that --
5    we were told -- and I'm not sure the documentation is
6    there, but I was also told that Mr. Onorato had sent
7    similar pictures in e-mails and things back to the
8    gentleman that sent this to him, that this was a
9    back-and-forth deal.
10           And so at that point in time -- and that
11   was another basis for the suspension, because, one, if
12   you're going to suspend one person for doing it and the
13   allegations are that it's two people doing it back and
14   forth, you pretty much have to suspend both of them.
15   So I would have told them that that was my
16   recommendation at the time.
17       Q. Do you have any e-mails to prove that
18   Mr. Onorato did that?
19       A. Not that I have seen, but I will tell you
20   that that's what I have been told. And I was told that
21   by Mr. -- the gentleman that sent this.
22       Q. Well, is Mr. McLain now working for or --
23   strike that.
24           At some point, was Mr. McLain allowed to
25   come back to work?

72

1        A. I don't know.
2        Q. Was Mr. Onorato ever allowed to come back to
3    work?
4        A. No.
5        Q. Why?
6        A. Because he filed a lawsuit. They're odd
7    about those things. When you sue the company, claiming
8    FSLA and claiming sexual harassment, and since it's
9    employment at will, we elected to go ahead and leave
10   him on indefinite stay.
11       Q. And that was your recommendation?
12       A. Yes. I don't want to get into
13   attorney/client privilege issues, but, yeah, that would
14   have been my recommendation.
15       Q. You don't know how many hours Mr. Onorato
16   worked; is that correct?
17       A. No.
18       Q. That is correct?
19       A. That is correct.
20       Q. Do you know whether Mr. Onorato was ever sent
21   a letter or any kind of notification telling him that
22   he's officially been terminated?
23       A. I don't know. You'd have had to check the
24   records that have been produced.
25       Q. Is it your understanding that he has been

**LLOYD WARD**
**July 6, 2011**

73

1  terminated, though?
2      **A.  I think so.**
3      Q.  All right.  But the other witnesses would
4  know more about that than you?
5      **A.  Yes.**
6      Q.  Do you know whether ABC ever started paying
7  overtime to the employees in Mr. Onorato's
8  classification?
9      **A.  I don't know.  You'd have to ask them.**
10         MR. WOOD:  Can we take five minutes?
11         (Recess taken, 11:06 to 11:26)
12      Q.  (By Mr. Wood) Do you know whether employees
13  like Mr. Onorato, answer the telephone Lloyd Ward &
14  Associates?
15      **A.  No, I don't.**
16      Q.  If he had, would there have been anything
17  wrong with it?
18      **A.  No.**
19      Q.  I assume Lloyd Ward & Associates has a
20  separate bank account from ABC?
21      **A.  Oh, yeah.**
22      Q.  Did you ever write checks on ABC's account?
23      **A.  No.  No access to it.**
24      Q.  Did you ever purchase or lease property, real
25  or personal, for ABC?

74

1      **A.  No.**
2      Q.  You meaning the law firm.
3      **A.  No.**
4      Q.  Did the law firm ever lend money to ABC?
5      **A.  No.**
6      Q.  Was the law firm aware of how ABC paid its
7  employees?
8      **A.  No.  I'm assuming it's ADP, but I don't know**
9  **that.**
10      Q.  Well, what I meant was whether they paid
11  their employees on an hourly or salary basis.
12      **A.  No.  Not until this lawsuit arose.**
13      Q.  All right.  You may have said this earlier,
14  but were the owners of ABC Kevin Devoto and Lloyd
15  Regner?
16      **A.  Those are the two I know of.  There may be**
17  **others.  I don't know.  Those are my contacts.**
18      Q.  Would the three of you sometimes meet to
19  discuss ABC business?
20      **A.  Only in respect to marketing for us or**
21  **lawsuits that might be pending, things along that line.**
22      Q.  Do you know the details of what you were able
23  to negotiate on behalf of the debtors -- let's strike
24  that.  Let me start over.
25         The debt negotiations that took place

75

1  with creditors, do you know how the program worked?  I
2  guess let me ask it that way.
3      **A.  Yes.**
4      Q.  Just give me a general explanation.
5      **A.  Sure.  We use a company called New World,**
6  **which is a third-party escrow company.  And we don't**
7  **have direct access to the bank accounts but we have the**
8  **ability to verify dollar amounts, for example, if they**
9  **have 3,000, 4,000, 5,000 in the account.  And we have**
10  **the ability to contact the creditors and negotiate down**
11  **whatever the settlement amount might be.**
12         **I can tell you that it varies based upon**
13  **the issuer.  For example, Discover Card, it's tough to**
14  **negotiate.  When you can get 80 cents on the dollar,**
15  **it's a good deal.  The average across the board is**
16  **about 35 cents on the dollar that it gets negotiated**
17  **down to, but there are some banks that we work with**
18  **that, based on the circumstances, you can get it for as**
19  **little as 20 cents on the dollar.  It obviously varies**
20  **from creditor to creditor.  I can tell you Discover is**
21  **a pain in the  butt.  I can tell you that the average**
22  **is about 35 cents on the dollar that, across the board,**
23  **we end up getting settlement done in.**
24      Q.  Do you know whether ABC ever pulled credit
25  reports on either potential clients or clients?

76

1      **A.  No.**
2      Q.  You don't know?
3      **A.  I don't know, but I would assume they don't**
4  **because that's one of the things we tell them not to**
5  **do.**
6      Q.  Did your law firm ever do that?
7      **A.  No.**
8      Q.  Do you know whether Kevin Devoto ever
9  encouraged the ABC employees to represent to potential
10  clients that the service being offered was attorney
11  debt negotiation?
12      **A.  I'm sure he did.  That was what was being**
13  **offered.**
14      Q.  Was it your recommendation that he do that?
15      **A.  It wasn't my recommendation, but that's what**
16  **I would expect.  In any of our marketing companies, I**
17  **expect them to market our services.  So if they're not**
18  **marketing our services, they're not going to be a**
19  **marketing company for long.**
20      Q.  Did you ever tell any Crown employee not to
21  hire Chris Onorato?
22      **A.  I don't even know who Crown is, so I would**
23  **have to say no.**
24      Q.  Do you know anyone named Corey Harbert?
25      **A.  No.**

**LLOYD WARD**
**July 6, 2011**

20 (Pages 77 to 80)

77

1      MR. WOOD:  Give me just one more minute.
2      (Recess taken, 11:32 to 11:34)
3      MR. WOOD:  Pass the witness.
4      MR. WARD:  Reservation.
5      (Proceedings concluded, 11:34)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

78

1              CHANGES AND SIGNATURE
2      WITNESS:  LLOYD EUGENE WARD  July 6, 2011
3      PAGE   LINE   CHANGE   REASON
4      _____
5      _____
6      _____
7      _____
8      _____
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19     _____
20     _____
21     _____
22     _____
23     _____
24     _____
25     _____

79

1          I, LLOYD EUGENE WARD, have read the foregoing
2      deposition and hereby affix my signature that same is
3      true and correct, except as noted above.
4
5
6
7              _____
               LLOYD EUGENE WARD
8
9
10     THE STATE OF _____ )
11     COUNTY OF _____ )
12
13         Before me, _____,
       personally appeared LLOYD EUGENE WARD, known to me (or
14     proved to me under oath or through
       _____) (description of identity card or
15     other document) to be the person whose name is
       subscribed to the foregoing instrument and acknowledged
16     to me that they executed the same for the purposes and
       consideration therein expressed.
17
18         Given under my hand and seal of office this
       _____ day of _____, _____.
19
20
21             _____
               NOTARY PUBLIC IN AND FOR
22             THE STATE OF _____
23
24
25

80

1      STATE OF TEXAS    *
2      COUNTY OF DALLAS  *
3          This is to certify that I, Deborah Marks,
4      Certified Shorthand Reporter, in and for the State of
5      Texas, certify that the foregoing oral deposition of
6      LLOYD EUGENE WARD, reported stenographically by me at
7      the time and place indicated, said witness having been
8      placed under oath by me, and that the oral deposition
9      is a true record of the testimony given by the witness.
10         I further certify that I am neither counsel for
11     nor related to any party in the case and am not
12     financially interested in its outcome.
13         Given under my hand on this the _____ day of
14     _____, 2011,
15
16
17
18
19
20     Deborah Marks, Texas CSR 64_
       Expiration date: 12/31/12
21     Firm No. 526
       Corporate Plaza, Suite 152
22     4950 N. O'Connor Road
       Irving, Texas 75062
23     972.719.5000
       972.717.3985
24
25