IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BRIAN PARKER, MICHAEL FRANK, | § | |
| MARK DAILEY, and JEREMY COZART, | § | |
| on behalf of themselves and all others | § | |
| similarly situated, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 3:10-CV-1332-P |
| ABC DEBT RELIEF, LTD. CO., THE | § | |
| DEBT ANSWER, LLC, LLOYD | § | |
| WARD, P.C. d/b/a LLOYD WARD & | § | |
| ASSOCIATES, LLOYD REGNER, and | § | |
| LLOYD WARD, | § | |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Now before the Court are: (1) Defendants Lloyd Ward and Lloyd Ward, P.C.'s Motion

for Summary Judgment (Docket #128), (2) Plaintiffs' Motion for Partial Summary Judgment

(Docket #131), (3) Defendants ABC Debt Relief, Ltd. Co., The Debt Answer, LLC, and Lloyd

Regner's Motion for Summary Judgment (Docket #132), (4) Plaintiffs' Motion to Strike

Defendants' Second Motion for Summary Judgment (Docket #139),[1] (5) Defendants' Motion for

Leave to File Amended Answer (Docket #161); (6) Plaintiffs' Motion to Strike Defendants'

Affidavit (Docket #162).

After careful consideration of these motions, evidence, and the applicable law, the Court

hereby DENIES Defendants Lloyd Ward and Lloyd Ward, P.C.'s Motion for Summary

---

[1] In their briefing, Plaintiffs put all their citations in footnotes, in contravention of long-standing Blue Book rules and litigation procedure. Presumably, Plaintiffs did this in an effort to circumvent the Local Rules' page limits. The Parties are prohibited from drafting their briefs in this way. If a party needs additional pages, it must follow the Court's rules and file a motion for leave requesting a page limit extension.

Judgment (Docket #128), GRANTS in PART and DENIES in PART Plaintiffs' Motion for

Partial Summary Judgment (Docket #131); DENIES Defendants' Motion for Summary

Judgment (Docket #132), DENIES Plaintiffs' Motion to Strike Defendants' Second Motion for

Summary Judgment (Docket # 139)[2], GRANTS Defendants' Motion for Leave to File Amended

Answer (Docket #161), and DENIES Plaintiffs' Motion to Strike Defendants' Affidavit (Docket

#162).

## **FACTS**

Plaintiffs Brian Parker, Michael Frank, Mark Dailey, and Jeremy Cozart (collectively,

"Plaintiffs") filed this collective action to recover unpaid overtime compensation on behalf of

themselves and their similarly-situated co-workers under the wage-and-hour provisions of the

Fair Labor Standards Act ("FLSA").[3] Defendants ABC Debt Relief, Ltd. Co. ("ABC"), The

Debt Answer, LLC ("The Debt Answer"), and one or more Lloyd Ward entities (collectively,

"Defendants") were engaged in the debt negotiation/debt settlement business. One or more

Defendants hired Plaintiffs and others to assist clients in reducing their amount of unsecured

debt. Plaintiffs worked for Defendants as either Salespeople, Customer Service Agents ("CSA"),

and/or Debt Negotiators.

Prior to 2009, ABC was owned and controlled by Defendant Lloyd Regner ("Regner")

and non-party Kevin Devoto. (Docket # 148-2 at 1.) Regner and Devoto also owned and

---

[2] Defendants' original summary judgment motion was denied as moot due to former Plaintiff Scott Woods's decision to withdraw from this lawsuit. Defendants are entitled to have the Court consider their arguments and have this case resolved on its merits.

[3] Plaintiffs filed this lawsuit on behalf of themselves and others similarly situated. Before and since the motion was filed, several other plaintiffs have consented to join this lawsuit.

controlled The Debt Answer.  Regner was the CEO of both companies and had general oversight over their day-to-day business operations.  (Docket # 148-6 at 474.)

Between 2009 and 2011, Regner, Devoto, and Defendant-attorney Lloyd Ward, entered into a complex series of agreements to combine their businesses into one or more debt settlement businesses.  Plaintiffs allege they consistently worked between 40 and 60 hours per week for Defendants but were not paid all overtime wages owed them under the FLSA.

The evidence establishes the enterprise worked like this: A Salesperson who worked for Defendants would contact debtors or take incoming calls from debtors.[4]  The Salesperson would follow a script that was designed to persuade the debtors to engage Defendants to assist them in solving their debt problems.  If the debtor agreed, he would sign an agreement with Defendants for debt negotiation services.

After the sale was closed, a Customer Service Agent ("CSA") would work with the client to assess his ability to pay down his debts.  The CSA would assist the client in developing a strategy for setting aside money for that purpose.  The CSA would communicate with the debtor on a regular basis to ensure the program was working as planned.  The CSA also made sure each client's file was current and contained all necessary documentation.[5]

Once the client had begun the process of setting aside funds to pay down his debts, a Negotiator would begin contacting each client's creditors to negotiate a settlement on the amount owed.  Non-litigation Negotiators worked with creditors before the creditor took legal action

---

[4]  Salespeople are also referred to as Debt Consultants, Debt Analysts, and Sales Staff.  For purposes of this opinion, they will be called "Salespeople."

[5]  CSAs are also referred to as Account Specialists, Client Specialists, Client Care Specialists, and Quality Assurance People.  For purposes of this opinion, they will be called CSAs.

against the debtor.  If a debtor was sued for money owed, the Legal Negotiators would negotiate the settlement.

## SUMMARY JUDGMENT STANDARD

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the burden of informing the district court of the basis for its belief that there is an absence of a genuine issue for trial and of identifying those portions of the record that demonstrate such absence.  *See Celotex*, 477 U.S. at 323.  However, all evidence and reasonable inferences to be drawn there from must be viewed in the light most favorable to the party opposing the motion. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Once the moving party has made an initial showing, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue.  Fed. R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).  The party defending against the motion for summary judgment cannot defeat the motion unless he provides specific facts demonstrating a genuine issue of material fact, such that a reasonable jury might return a verdict in his favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  Mere assertions of a factual dispute unsupported by probative evidence will not prevent summary judgment.  *See id.* at 249–50.  In other words, conclusory statements, speculation, and unsubstantiated assertions will not suffice to defeat a motion for summary judgment.  *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc); *see also Abbott v. Equity Group, Inc.*, 2 F.3d 613, 619 (5th Cir. 1993)

("[U]nsubstantiated assertions are not competent summary judgment evidence." (citing *Celotex*, 477 U.S. at 324)). Further, a court has no duty to search the record for evidence of genuine issues. *See Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

## DISCUSSION

### I. Employer Status under the Fair Labor Standards Act.

#### A. Lloyd Regner.

Both Defendants and Plaintiffs move for summary judgment on Defendant Lloyd Regner's status as an employer under the FLSA. The FLSA defines "employer" as any person acting directly or indirectly in the interest of an employer in relation to an employee . . ." 29 U.S.C. § 203(d). The FLSA defines the employment relationship "expansively" and with "striking breadth." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992). The broad interpretation of the employer-employee relationship under the FLSA "is intended to identify responsible parties without obfuscation by legal fictions applicable in other contexts." *Dole v. Simpson*, 784 F. Supp. 538, 545 (S.D. Ind. 1991); Richard J. Burch, *A Practitioner's Guide to Joint Employer Liability Under the FLSA*, 2 Hous. Bus. & Tax L. J. 393, 402 (2002). "Not surprisingly, the Supreme Court has referred to the FLSA's definition of employer as 'the broadest definition that has ever been included in any one act.'" Burch, *supra,* at 403 (quoting *United Sates v. Rosenwasser*, 323 U.S. 360, 363 n.3 (1945)).

"The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *Donovan v. Grim Hotel Co.,* 747 F.2d 966, 972 (5th Cir. 1984). A corporate officer with "managerial responsibilities" and "'substantial control of the terms and conditions of the [employer's] work'" has statutory

employer status. *Id.* at 971. In the Fifth Circuit, courts examine the employment relationship in light of "economic realities." *Williams v. Henagan*, 595 F.3d 610, 620 (5th Cir. 2010). The "economic reality" test requires courts to inquire into whether the alleged employer (1) has the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records. *Watson v. Graves*, 909 F.3d 1549, 1553 (5th Cir. 1990). Whether a person is an employer under the FLSA is a question of law. *Beliz v. W.H. McCleod & Sons Packing Co.,* 765 F.2d 1317, 1327 (5th Cir. 1985); *Castillo v. Givens*, 704 F.2d 181, 187 n.12 (5th Cir. 1983).

Defendants argue this case should be dismissed against Regner because he is not an employer under the FLSA. They contend he does not satisfy the definition of "employer" because he had virtually no interaction with Plaintiffs. Defendants maintain there is no evidence that Regner had the power to hire or fire Plaintiffs, that he supervised or controlled Plaintiffs' work schedules or employment conditions, or that he determined the rate and/or method of paying Plaintiffs. (Docket #133 at 20-22.) They argue he is no longer currently involved in the day-to-day operations of ABC. (Docket #159 at 13.) Regner testified Mr. Rick Longo was the daily decision maker with regard to hiring, policy enforcement, and employee compensation.

Plaintiffs contend that as an officer and owner of ABC and The Debt Answer, Regner is an employer as contemplated by the FLSA. (Docket #148-1 at 16-17.) In his own deposition, Regner identifies himself as CEO/CFO of ABC. (Docket #148-6 at 474.) In the beginning, he "took care of the day-to-day business operations of anything and everything under the sun." (Docket #148-6 at 474.) Anybody with an issue would come to him. (Docket #148-6 at 474.) The decision-making was with him. (Docket # 148-6 at 474.) The "buck stopped with" him.

(Docket # 148-6 at 474.)  Regner took care of the companies' accounting and the marketing.

(Docket # 146-8 Ex. 10.)[6]  He hired the salespeople.  (Docket # 146-8 Ex. 10.)  Regner was also

the Secretary/Treasurer and thus, held the purse strings.  (Docket #148-2 at 101.)  Regner

explained in his deposition that as the company grew, he began to rely on others to manage many

of these areas.  (Docket #148-2 at 1121-22.)    Though he continues to be in charge of the

financial and customer-service sides of the company, he relies on his managers to give the staff

direction and guidance.  (Docket #148-2 at 1121-22.)    Plaintiff Parker explained during his

deposition that Regner "was the owner.  He interviewed me, hired me.  And if I ever needed any

questions addressed during – as far as payroll or things like that, I would go to Lloyd [Regner]."

(Docket # 148-6 at 518.)[7]

The material facts are not in dispute here.  The evidence establishes that as CEO/CFO,

Regner is a corporate officer with operational control of ABC Debt Relief and The Debt Answer.

Regner has managerial responsibilities over the people he hires to give the staff direction and

guidance.  As the executive in charge of ABC's finances, Regner has substantial control over the

companies' compensation and overtime classification policies.  (Docket #148-4 at 294.)  As the

executive in charge of the customer-service sides of the company, Regner has substantial control

of the terms and conditions of the companies' work.  (Docket #148-4 at 294.)  The evidence

establishes that Regner acts directly in the interest of ABC and The Debt Answer in relation to

---

[6] Defendants' appendix in response to Plaintiffs' motion for summary judgment (Docket # 146-7 – 146-12) is not paginated in accordance with the Local Rules.

[7] Regner repeatedly relies on *Reich v. Circle C Investments, Inc.*, 998 F.2d 324, 329 (5th Cir. 1993) for the principle that a court "must determine whether the individual "effectively dominates [the employer's] administration or otherwise acts, or has the power to act, on behalf of the employer vis-a-vis its employees."  *Circle C* is inapposite to this case.  *Circle C* analyzes whether an individual, "lacking a possessory interest in the company" may be considered an employer of that company under the FLSA.  In this case, Regner does have a possessory interest in the company – he is an owner and officer.  Thus, a less stringent standard applies.

their employees. It is undisputed that Regner has "managerial responsibilities" and "substantial control of the terms and conditions of the work of the employees." *Falk v. Brennan*, 414 U.S. 190, 195 (1973). Therefore, the Court concludes Regner is an employer as defined by the FLSA.

### B. Lloyd Ward and Lloyd Ward, P.C.

Both Parties move for summary judgment on Defendants Lloyd Ward and Lloyd Ward, P.C.'s statuses as Plaintiffs' employers under the FLSA. Plaintiffs argue Lloyd Ward and Lloyd Ward, P.C. are joint employers with ABC and The Debt Answer and therefore are liable as Plaintiffs' employers. Where an employee performs work that simultaneously benefits more than one employer, the concept of "joint employment" imposes individual and joint FLSA liability on all employers. 29 C.F.R. § 791.2(a). When determining whether joint employment exists, courts examine the totality of the circumstances – focusing on the economic realities of the particular employment relationship. *Reich v. Prima Corp.*, 890 F. Supp. 586, 590 (N.D. Tex. 1995); *Wirth v. Lone Star Steel Co.,* 405 F.2d 668, 669 (5th Cir. 1968). Joint employment is construed broadly, and labels and contractual terms used in a particular relationship are largely unimportant. Burch, *supra*, at 406.

The economic reality test in the joint employer context should not be used in an effort to determine which entity is more of an employer in relation to the proposed employee "with the winner avoiding responsibility as an employer." *Antenor v. D&S Farms*, 88 F.3d 925, 932 (11th Cir. 1996). Indeed, the fact that the employee is admittedly an employee of another employer does not preclude a finding that another employer is a joint employer. *Falk*, 414 U.S. at 195.

In *Wirtz v. Lone Star Steel Co.*, the Fifth Circuit held that in considering whether a person or corporation is a joint employer under the FLSA, the total employment situation should be considered, with particular regard to the following inquiries: (1) whether the employment takes

place on the premises of the company, (2) how much control the company exerts over the employees, (3) whether the company has the power to fire, hire, or modify the employment condition of the employees, (4) whether employees perform a 'specialty job' within the production line, and (5) whether the employees may refuse to work for the company or work for others. 405 F.2d 668, 669-70 (1968).

In addition to the *Wirtz* test, the Code of Federal Regulations offers examples of joint employment. 29 C.F.R. § 791.2(b). The regulations state, "a joint employment relationship generally will be considered to exist in situations such as: (1) Where there is an arrangement between the employers to share the employee's services . . . or (2) Where one employer is acting directly or indirectly in the interest of the other employer [ ] in relation to the employee or (3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with another employer." 29 C.F.R. § 791.2(b).

When material facts are not in dispute, whether a party is a joint employer is a question of law. *See Castillo*, 704 F.2d at 187 n.12; *Itzep v. Target Corp.*, 543 F. Supp. 2d 646, 652-53 (W.D. Tex. 2008).

According to the Lloyd Ward Defendants, Defendant Lloyd Ward, P.C. is not "doing business as" Lloyd Ward & Associates, as alleged by Plaintiffs in their Complaint. (Docket #130 at 4.) They maintain Defendant Lloyd Ward, P.C. has no connection to ABC or The Debt Answer. (Docket #130 at 4.) The Lloyd Ward Defendants concede that Mr. Ward's two other entities – Lloyd Ward & Associates, P.C. and The Lloyd Ward Group, P.C. – have done business with ABC and/or The Debt Answer. (Docket #130 at 4.) According to the Lloyd Ward

Defendants, they explained this distinction to Plaintiffs, but Plaintiffs never amended their Complaint to include the other entities. The Lloyd Ward Defendants argue this failure is fatal to Plaintiffs' claims because in Texas, where there are two separate and distinct corporations and the wrong corporation is sued through mistaken identity, no judgment can be rightfully rendered against it. *Stessel v. Begins Van & Storage Co.,* 461 S.W.2d 434, 436 (Tex. Civ. App. - San Antonio 1970, no writ). (Docket #129 at 11-13.)

The material facts are not in dispute. The evidence establishes that in late 2009, ABC entered into an Employee Lease and Services Agreement with Lloyd Ward & Associates, P.C. ("LWA"). The Parties agreed that LWA would lease employees from ABC. ABC would provide the trained personnel, administrative support, and office space for the employees. The leased employees were required to adhere to and comply with the LWA-workplace rules and obligations as employees of LWA. (Docket # 148-2 at 2.) LWA was responsible for supervising, directing, training, and controlling these leased employees with respect to all dealings with LWA's clients. (Docket # 148-2 at 2-3.) Lloyd Ward is the signatory on the Employee Lease and Services Agreement.

A similar Employee Lease and Services Agreement was entered into between The Lloyd Ward Group, P.C. ("LWG")[8] and RegDev Enterprises (a Regner and Devoto entity) in late-2009, whereby RegDev leased employees to LWG to service the debts of LWG's clients. (Docket # 148-2 at 8-14.)

Another agreement - an Asset Purchase Agreement - was entered into in early-2011 between Regner and Devoto as members of The Debt Answer (seller) and Lloyd Ward, P.C.

---

[8]The Lloyd Ward Group PC was owned by Kevin Devoto (42.5%), Lloyd Regner (42.5%), and Lloyd E. Ward (15%). (Docket # 148-2 at 72.)

10

(purchaser), whereby Lloyd Ward, P.C. offered to purchase certain assets of The Debt Answer – specifically, its customer lists, all telephone equipment, all files and folders, and all ongoing residual accounts receivable. (Docket # 148-2 at 30.) According to the Asset Purchase Agreement, "Lloyd Ward, P.C. operates a debt settlement business." (Docket # 148-2 at 30.) The Asset Purchase Agreement then provides that the "[a]ccounts receivable and future payments due from the customers will be the property of Lloyd Ward Group, PC." (Docket # 148-2 at 30.) But the seller will remain the employer of the employees. (Docket # 148-2 at 31.) The Asset Purchase Agreement also provides that "certain services may be shared and The Debt Answer may advise Lloyd Ward, P.C. or conduct work on behalf of Lloyd Ward, P.C. on a fee, profit sharing or ownership basis." (Docket # 148-2 at 31.)

        As a practical matter, Lloyd Ward joined forces with ABC and The Debt Answer to sell, service, and negotiate client debts that were involved in litigation. As an attorney, Lloyd Ward put his imprimatur on all ABC/The Debt Answer work that involved debts that were being litigated.        Additionally, the Salespeople worked for Lloyd Ward/The Debt Answer. The Salespeople persuaded debtors to engage attorney Lloyd Ward's law firm to assist them in solving their debt problems. The clients signed a contract for debt negotiation services that purported to be between the client and The Lloyd Ward Group. The agreements were issued on Lloyd Ward, P.C. letterhead and listed Lloyd Ward as the attorney responsible for providing the legal business of negotiating the client's unsecured debts. (Docket # 148-2 at 84-87, 89-93.) Clients also entered into an Authorization for Debt Negotiation agreement that was drafted on *Lloyd Ward & Associates* letterhead. Underneath the *Lloyd Ward & Associates* heading is *Lloyd Ward P.C.* (Docket # 148-2 at 88, 94.)

The evidence indicates that Defendants wanted employees, clients, and creditors to believe that Lloyd Ward, Esq. of Lloyd Ward PC and/or Lloyd Ward & Associates was in charge of the debt settlement operation and its employees. (Docket # 148-2 at 84, 88; 148-4 at 320; 148-4 at 323) As a practical matter, all Lloyd Ward entities, including Lloyd Ward himself, combined to form the entity(ies) responsible for conducting the debt negotiations. Plaintiffs performed work that benefitted Lloyd Ward and Lloyd Ward, P.C. The Employee Lease Agreement was an arrangement between the employers (ABC, The Debt Answer and the Ward entities) to share the employees' services. This is one of the key characteristics of a "joint employer" as described in the FLSA regulations. Similarly, these employers are not completely disassociated with respect to the Plaintiffs' employment and they do share control of the employees. Ward's, Devoto's, and Regner's debt settlement businesses are completely intertwined – all are responsible for the employees' supervision, conduct, and work conditions, as set forth both in the agreement and in practice. Furthermore, Lloyd Ward and the employees worked out of the same building. From all this evidence the Court concludes that Lloyd Ward had the power to fire, hire, and modify the employees' employment. *See Wirth*, 405 F.2d at 669-70.

For these reasons, the Court finds the evidence establishes as a matter of law that Plaintiffs are employees of Defendants Lloyd Ward and Lloyd Ward, P.C., as joint employers of ABC and The Debt Answer. Therefore, the Court DENIES Defendants Lloyd Ward and Lloyd Ward, P.C.'s motion for summary judgment and GRANTS Plaintiffs' motion for summary judgment on the issue of the Lloyd Ward Defendants' status as a joint employer.

## II.    **FLSA Exemptions from Overtime Compensation.**

Both Parties move for summary judgment on Defendants' affirmative defense that they are exempt from paying overtime because (1) their business falls within the retail exemption and (2) Plaintiffs were administrative employees.

Under the FLSA, an employer must not employ any of its employees for a work week longer than forty hours without compensating the employee at a rate of one and one-half times his regular rate for the excess hours, unless a statutory exception applies.  29 U.S.C. § 207(a)(1).  Certain employees, however, are not covered by the overtime provisions.

Interpretations of the FLSA and its regulations are questions of law.  *Gieg v. DDR, Inc.*, 407 F.3d 1038, 1044 (9th Cir. 2005).  Employers have the burden of demonstrating that a particular employee or category of employees is not within the ambit of the overtime provision of the FLSA.  *Brennan v. Great Am. Discount and Credit Co.*, 477 F.2d 292, 293-94 (5th Cir. 1973).  The exemptions are to be narrowly construed against those seeking to assert them, giving due regard to the plain meaning of the statutory language and the intent of Congress.  *Geig,* 407 F.3d at 295.


### A.    **Retail Exception.**

The overtime provisions of the FLSA contain certain exceptions, one of which can exempt an employer from paying overtime to employees who work at a retail or service establishment.  29 U.S.C. § 207(i).  Defendants argue ABC and The Debt Answer are retail and/or service establishments within the meaning of the FLSA, and therefore, were not required to pay the Salespeople Plaintiffs overtime.  (Docket #133 at 5.)

#### 1.    **Waiver and Defendants' Motion for Leave to Amend Answer.**

Plaintiffs argue Defendants waived this affirmative defense because they failed to assert it in any responsive pleading and are raising it for the first time at the summary judgment stage. (Docket #148-1 at 27.) Defendants concede this fact but maintain Plaintiffs are not unduly prejudiced or surprised by this defense because Defendants took this position in their answers to interrogatories. (Docket #131-2 at 89.) They also argue Plaintiffs cannot be surprised by this argument because one of the main issues covered during the depositions was the nature of Plaintiffs' work. (Docket #159 at 1.) In conjunction with their reply, Defendants filed a motion for leave to amend their answer to add the retail exemption as an affirmative defense. (Docket #161.)

Plaintiffs argue the Court should not allow Defendants to add this affirmative defense at this late stage of the litigation. They maintain Defendants have had ample time and plenty of opportunities to amend their answer to add this defense.

After careful consideration of the briefing, evidence, and applicable law, the Court finds Defendants are not seeking this amendment for the purpose of delay or in bad faith. Plaintiffs will not be prejudiced by this amendment because they were able to, and did, address this topic during discovery and in their briefing. There is ample evidence in the record for the Court to make a determination, giving due consideration to both Parties' positions. In the interest of resolving this case on its merits, the Court hereby GRANTS Defendants' motion for leave to amend. (Docket # 161).

### 2. Are the Salespeople Exempt from Overtime Pay Under the Retail Exemption?

To demonstrate the retail exemption applies to the Salespeople Plaintiffs, Defendants must show (1) the Salespeople Plaintiffs are Salespeople whose regular rate of pay exceeds one

and a half times the minimum hourly rate under the FLSA and who earn more than half their

compensation as commissions on goods or services and (2) the Salespeople Plaintiffs worked for

a "retail or service establishment." 29 U.S.C. § 207(I).

Defendants argue the Salespeople Plaintiffs are exempt from overtime pay under this

exemption because they engage in telephone sales of a specific retail product to the general

public. (Docket # 148-4 at 296.)

To determine whether an employer is a "retail or service establishment," courts look to

the former statutory definition in Section 13(a)(2) of the FLSA, 29 U.S.C. § 213(a)(2), which

defines a "retail or service establishment" as one in which 75% of the annual dollar volume of

sales of goods or services is "not for resale" and "is recognized as retail sales or services in the

particular industry." *See* 29 C.F.R. 779.319; *Geig*, 407 F.3d at 1047.

"Determination of whether a business fits the retail concept is not without difficulty."

*Brennan*, 477 F.2d at 296. In making their determinations, courts consistently rely on the

expertise of the Department of Labor, which has promulgated an extensive series of regulations

and interpretive rules that accompany the statute. *See* 29 C.F.R. § 779.300 *et seq*. Although

courts are not bound by interpretative bulletins, they do provide guidance because they reflect

the position of those most experienced with the application of the Act. *Brennan*, 477 F.2d at

296-97. Courts must consider all circumstances relevant to the business at issue. 29 C.F.R.

779.318(b).

The pertinent regulations state:

Typically, a retail or service establishment is one which sells goods or services to
the general public. It serves the everyday needs of the community in which it is
located . . . Such an establishment sells to the general public its food and drink. It
sells to the public its clothing and its furniture, its automobiles, its radios and
refrigerators, its coal and its lumber, and other goods, and performs incidental

15

services on such goods when necessary. It provides the general public its repair services and other services for the comfort and convenience of such public in the course of its daily living. Illustrative of such establishments are: Grocery stores, hardware stores, clothing stores, coal dealers, furniture stores, restaurants, hotels, watch repair establishments, barber shops, valet shops, and other such local establishments.

29 C.F.R. § 779.318(a).

The Department of Labor's regulations consistently emphasize that the exemption is meant to apply to "traditional" local retail establishments. 29 C.F.R. §§ 779.314, 779.315, 779.317. To assist the public, the regulations identify certain establishments as traditional local retail or service establishments – *e.g.,* restaurants, hotels, barber shops, and repair shops. The regulations also seek to assist the public by identifying establishments that do not fall within the exception – *e.g.*, insurance companies that sell insurance and electric companies that sell power. 29 C.F.R. §§ 779.316, 779.317. The Fifth Circuit has noted this "'demonstrates that not everything the consumer purchases can be a retail sale of goods or services' and 'industry usage is not controlling.'" *Brennan*, 477 F.2d at 295 (citation omitted).

The regulations elaborate further on the definition by stating that "an establishment, wherever located, will not be considered a retail or service establishment within the meaning of the Act, if it is not ordinarily available to the general consuming public." 29 C.F.R. § 779.319. "An establishment does not have to be actually frequented by the general public in the sense that the public must actually visit it and make purchases of goods or services on the premises in order to be considered as available and open to the general public. A refrigerator repair service shop, for example, is available and open to the general public even if it receives all its orders on the telephone and performs all of its repair services on the premises of its customers." *Id.*

In this case, Defendants operated a debt settlement business from the eighth and tenth floors of an office building in Dallas, Texas.  There were three main aspects to this debt settlement operation  – sales, customer service, and negotiation with creditors.  The Salespeople recruited the clients.  They were constantly making telephone calls (around 300 calls a day)[9] – to prospective customers all over the country – trying to sell a service.  This is not the type of service that is utilized by the general public in the course of their daily living.  Defendants were not "serv[ing] [an] everyday need [ ] of the community."   Defendants did not operate from a store front.  They did not serve the general public by providing a retail product or service in the traditional sense.  Defendants' debt negotiation and settlement business was similar to other establishments that lack a "retail concept" – such as banks, brokers, credit companies, and loan offices. 29 C.F.R. § 779.317.[10]

For these reasons, the Court finds that Defendants did not establish their burden of proving they operate a retail or service establishment within the meaning of the FLSA.  The Court hereby DENIES Defendants' motion for summary judgment on the retail or service establishment exemption and finds as a matter of law the salespeople Plaintiffs are not exempt from overtime pay under the retail or service exemption.

### 3.    Are CSAs and Debt Negotiators Exempt Under the Administrative Exemption?

Plaintiffs and Defendants argue they are entitled to summary judgment with respect to the exemption status of Customer Service Agents and Negotiators.  Defendants contend these

---

[9]  Docket #148-6 at 516.

[10]  Defendants cite two cases that exempted telemarketers working in a sales capacity under the retail or service establishment exemption. (Docket #133 at 6 citing *English v. Ecolab, Inc.*, 06-CV-5672(PAC), 2008 WL 878456 (S.D.N.Y. Mar. 31, 2008); *Selz v. Investools, Inc.*, 2:09-CV-1042TS, 2011 WL 285801 (D. Utah, Jan. 27, 2011)). The Court notes each case must be decided on its specific facts and those cases are not binding in this jurisdiction.

Plaintiffs are exempt from overtime pay under the "administrative employee" exemption of the FLSA.

### a.     Customer Service Agents (CSAs).

To establish this exemption, Defendants must show the CSAs and Negotiators performed "executive or administrative duties" and were paid on a "salary basis".  *See Auer v. Robbins*, 519 U.S. 452, 455 (1997).   The duties test prong of the administrative exemption requires the defendant to establish that an employee's primary duty (1) is "the performance of office or non-manual work directly related to the management or general business operations" of the employer's business and (2) "includes the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a)(2), (3).

The Department of Labor has promulgated regulations to provide guidance for determining whether an employee serves in an administrative capacity for purposes of exemption.  To be exempt from the overtime pay requirement, an employee must "perform work directly related to assisting with the running or servicing of the business" as distinguished from selling or providing the employer's services (such as working on a manufacturing production line or selling a product in a retail or service establishment).  29 C.F.R. § 541.201(a).  The Labor Department lists certain types of work that are "directly related to the management or general business operations."  The list includes work in "functional areas" such as tax, accounting, advertising, human resources, computer network systems, and legal compliance.  29 C.F.R. § 541.201(b).  This provision explains "employees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example) may be exempt."  *Id.* at § 541.201(c).

The regulations also include a provision that describes whether an employee in the "financial services industry" meets the duties requirement for the administrative exemption. *Id.* at § 541.203(b). An employee in the financial services industry generally meets the duties requirement if their work includes "collecting and analyzing information regarding the customer's income, assets, investment or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing, or promoting the employer's financial products. *Id.*

With respect to the "exercise of discretion and independent judgment" prong, the regulations provide that the employee's primary duty must include the exercise of discretion and independent judgment with respect to "matters of significance." 29 C.F.R. § 541.202(a). "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." *Id.* The term "matters of significance" refers to the level of importance or consequence of the work performed. *Id.*

Factors to consider when determining whether an employee "exercises discretion and independent judgment with respect to matters of significance" include

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operation of the business; whether the employee performs work that affects business operations to a substantial degree . . .; whether the employee has the authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of

significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. § 541.202(b).

Defendants argue the Negotiators and the CSAs performed the precise work specifically outlined in § 541.203(b) describing exempt employees in the financial services industry. Plaintiffs argue the CSAs are not exempt because they did not hold managerial positions and were not authorized to use their own discretion and independent judgment with respect to "matters of significance." Instead, these employees provide the actual product to the customers: the debt servicing and maintenance. (Docket #131 at 25-27.)[11] Plaintiffs argue the negotiators are non-exempt from overtime pay under this exemption because they are production employees, whose function is to service the debts – a day-to-day operation function – rather than managerial employees. (Docket #131 at 27.)[12] They maintain neither group of Plaintiffs helps run the business or determines its policies. (Docket #131-1 at 25-27.)

According to the evidence, the CSAs spent virtually all of their time following certain rules and procedures – taking client calls, contacting clients (approximately 80 calls a day), updating and managing client files, and advising clients about their debt-related issues – all in an effort to ensure the clients made their payments. (Docket #148-6 at 530, 532; #134-3 at 297, 313, 373.) Depending on the policies and procedures in place at a particular time, CSAs were responsible for gathering basic information from clients, regularly assessing their financial situations (their income, assets, and debts), helping clients prioritize their debts, sending out

---

[11] Plaintiffs cite to a recent California district court opinion and a Labor Department opinion letter regarding mortgage loan officers, which they contend are analogous to CSAs. *See Kluss et al. v. Credit Exchange Corp. et al.,* Case No. SACV 09-00080-CJC(MLGx) (C.D. Cal. Jan. 27, 2011).

[12] Plaintiffs contend the Negotiators resemble those of a case manager who works with disabled individuals, whom the Labor Department determined did not qualify under the administrative exemption. (Docket #131-1 at 27.)

summons packets to clients for them to fill out, working with clients to develop payment arrangements they could comply with, asking their clients whether they had received letters from creditors, and confirming their clients made their payments. (Docket #148-6 at 492; #134-2 at 314, 327; #136-1 at 736.)

The CSAs' job responsibilities were clearly defined – for example, CSAs were required to contact assigned clients on a regular basis according to procedural rules using form correspondence. They were required to contact a certain number of clients each day in accordance with company rules. They were required to maintain and update client files to make sure all required documents were in there according to checklists. They were required to keep notes on each client's file. They were required to help clients respond to summons and process if they had been sued on the debt by sending them forms and walking them through the forms. They were required to help clients identify and prioritize their debts. (Docket #134-2 at 372-78, 421, 549-550, 588.) Fairly minor discrepancies in the paperwork and minor issues could be handled by CSAs. All other issues required management intervention. (Docket #134-2 at 374-76, 380; Docket #135-2 at 559.) The CSAs had no authority to change payment terms, to waive penalties, or to change the program terms. Even missing documents or unsigned documents in the file were directed to management. (Docket # 135-2 at 551, 558.)

None of the work performed by CSAs involved tasks directly related to the companies' management or general business operations. Instead their tasks were narrowly defined and closely monitored. Their ability to exercise discretion and independent judgment with respect to matters of significance is negligible. Therefore, Defendants have not met their burden of proving the CSAs are exempt from overtime pay under the administrative exemption.

### b. Negotiators

The Negotiators were responsible for negotiating on the client's behalf with the client's creditors. (Docket #133 Exs. 5, 6; #148-4 at 295-96, 493.) The "Negotiators" worked to settle with creditors before the creditor sued the client. Once a creditor sued, the "Legal Negotiators" worked to settle the debts. (Docket #134-2 at 301.) Every client had a Negotiator and a Legal Negotiator on his account. The Negotiators began negotiating with a client's creditors and debt collectors once the client had put some funds into the program – so there would be something to negotiate with. (Docket #136-1 at 744.) The Legal Negotiators began negotiating once legal action had been taken against a client, whether the client had funds in the program or not. (Docket #136-1 at 744.) A Negotiator's goal was to settle each client's debt for a percentage of the amount owed, to be paid over a set period of time in monthly installments. All Negotiators had discretion to decide what debts to deal with first, when and with whom to make settlement offers, and in what amount. (Docket #136-1 at 762.) Negotiators advised clients by recommending paying off the smallest debts first. (Docket #136-1 at 762-63.) Legal Negotiators advised clients how to handle basic litigation issues – how to respond to discovery, how to interpret scheduling orders, how to draft a responsive pleading, how to negotiate a settlement, and how to handle garnishment, liens, and judgments. (Docket #136-1 at 768-70.) Once a settlement was reached, Negotiators were responsible for setting up the settlement, scheduling the payment dates, and releasing the client's funds from the escrow account to the creditor. (Docket #136-3 at 892.)[13]

---

[13] One of the Negotiator Plaintiffs is Jessica Casey. Casey began working for The Debt Answer during its infancy. At that time, there were no procedures in place for Negotiators to follow. She made up her procedures as she went along based on her prior experience. (Docket #146-1 at 755.) Then she began developing procedures for employees to follow regarding how to handle a client's debt litigation from summons through resolution. (Docket #136-1 at 748-49.) She also designed a training program for the Negotiators. (Docket #136-1 at 751.) She drafted a form answer - as in a responsive pleading to a legal action – that was used by The Debt Answer. (Docket #136-1 at 766-67.) She developed a manual of basic information. (Docket #136-1 at 766-67.) However, she had to get

As with the retail exemption, whether an employee is exempt under the administrative exemption must be made on a case-by-case basis, taking into consideration the specific facts of each case. The regulations make clear there is a distinction between running the business and providing the service or product of the business. 29 C.F.R. § 541.201(a). The evidence establishes that neither the CSAs nor the negotiators exercised discretion and independent judgment with respect to matters of significance. There is no evidence these employees had any authority to formulate, affect, interpret, or implement management policies or operating practices. These employees had limited discretion to make decisions regarding the handling of their client's debts and debt negotiation. They used checklists (Docket #148-5 at 376; 134-3 at 376), gathered documents (Docket #148-6 at 504), used templates and forms for correspondence (Docket #148-5 at 379-80, 134-3 at 378-80), and followed negotiation procedures and guidelines that were set up by management (Docket #148-6 at 505). None of these Plaintiffs carried out major assignments regarding the operation of the business. None of these Plaintiffs performed work that affected business operations to a substantial degree and none had the authority to commit the employer in matters that had significant financial impact. There is no evidence Plaintiffs were authorized to waive or deviate from established policies and procedures without prior approval. There is no evidence Plaintiffs had authority to negotiate and bind the company on any significant matters. There is no evidence Plaintiffs provided consultation or expert advice to management. There is no evidence Plaintiffs were involved in planning long- or short-term business objectives. There is no evidence Plaintiffs investigated and resolved matters of

management approval to implement these work management procedures. (Docket #136-2 at 821-22.) She was not authorized to implement procedures using her own discretion. (Docket #136-1 at 752.)

significance on behalf of management. There is no evidence Plaintiffs represented the company in handling complaints, arbitrating disputes or resolving grievances. *See* 29 C.F.R. § 541.202(b).

These Plaintiffs did not work with or have substantive contact with Regner, Ward or Devoto – the companies' principals. (Docket #134-2 at 334-35; #135-2 at 554; #136-2 at 817-18; #136-3 at 860.) They reported to their direct supervisors. These Plaintiffs were the "line workers" of this enterprise. In fact, they had only limited decision-making authority when it came to dealing with clients. (Docket #134-3 at 378-80.) There is no evidence these Plaintiffs were involved in any kind of corporate policymaking. They followed the rules and did not have ultimate decision-making responsibilities or authority. The evidence establishes these "line workers" often worked for other debt management/settlement companies in the same or similar capacities. Because these companies all use the same type of business model, the employees are able to move from company to company once they have acquired the industry knowledge to do the job. (Docket #134-2 at 320.) None of these employees needed special knowledge or had responsibilities unique to Defendants' company – their work was standard for this line of work in the industry. Plaintiffs worked in an office space divided into cubicles and spent their days making calls to check on their clients. (Docket #134-2 at 299, 306, 314, 315.) Anything deviating from the norm required manager approval.

None of the work performed by the Negotiators involved tasks directly related to the companies' management or general business operations. Instead their tasks were narrowly defined and closely monitored. Their ability to exercise discretion and independent judgment with respect to matters of significance is negligible. Therefore, Defendants have not met their burden of proving the Negotiators are exempt from overtime pay under the administrative exemption.

For these reasons, the Court hereby DENIES Defendants' summary judgment motion and GRANTS Plaintiffs' motion for summary judgment on this issue. The Plaintiff CSAs and Negotiators (legal and non-legal) are non-exempt employees as a matter of law.[14]

## III.    OVERTIME PAY.

Plaintiffs and Defendants move for summary judgment on the issue of damages. Plaintiffs argue Defendants failed to adequately compensate Plaintiffs for all overtime hours worked. (Docket #131-1 at 18-20.) Defendants argue (1) Plaintiffs cannot offer any competent evidence of any alleged damages and (2) Plaintiffs cannot establish they worked more than forty hours in a given week. (Docket #133 at 13-17.)

An employee bringing an action pursuant to the FLSA based on unpaid overtime compensation must first demonstrate he has performed work for which he was not compensated. *Harvill v. Westward Comms., L.L.C.,* 433 F.3d 428, 441 (5th Cir. 2005). However, because the employer, and not the employee, is in the best position to keep accurate employment records for each of its employees, once an employee has proved that he performed work for which he was not compensated, the burden shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference to be drawn from the employee's evidence. *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 686-87 (1946); *Escobedo v. Dynasty Insulation Inc.*, 694 F. Supp. 2d 638, 647 (W.D. Tex. 2010).[15] An employer's failure to come forward with such evidence permits a court to award approximate

---

[14]    Plaintiffs move for summary judgment on the issues of whether the "outside sales" exemption or any other Section 213 exemptions apply. Defendants did not plead any of these exemptions and did not move for summary judgment on these exemptions. Therefore, the Court will not address the applicability of these exemptions. (Docket #131-1 at 29-30.)

[15]    The FLSA requires employers subject to the Act to maintain and preserve records of their employees and the employees' wages and hours. 29 U.S.C. § 211(c).

damages to the employee. *Anderson,* 328 U.S. at 688; *Donovan v. Hamm's Drive Inn*, 661 F.2d 316, 318 (5th Cir. 1981); *Escobedo*, 694 F. Supp.2d at 647. "The employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had it kept records in accordance with the requirement of . . . the Act. And even where the lack of accurate records grows out of a bona fide mistake as to whether certain activities or non-activities constitute work, the employer, having received the benefits of such work, cannot object to the payment for the work on the most accurate basis possible under the circumstances." *Anderson*, 328 U.S. at 688. "Evidence used to calculate wages owed need not be perfectly accurate, since the employee should not be penalized when the inaccuracy is due to a defendant's failure to keep adequate records." *Donovan*, 661 F.2d at 318.

Plaintiffs argue they have established as a matter of law they worked more than 40 hours per week based on Defendants' own incomplete records and Plaintiffs' testimony. (Docket #131-1 at 18; #131-5 at 485-522.) Defendants concede their records are incomplete and inaccurate, and therefore, attempt to utilize employee phone logs to calculate time worked. From these phone logs, Defendants conclude Plaintiffs worked less than 40 hours per week.

It is undisputed that Defendants failed to keep accurate records. Consequently, the burden shifts to Plaintiffs to provide an approximate calculation of their overtime hours. Plaintiffs' witnesses described a management that set high performance goals and expected employees to work in excess of 40 hours, if that's what it took to reach the goals. Plaintiff Jeremy Cozart (a CSA) testified that the "schedule" was "8:00 to 5:00, but we were still required to get the job done. If that meant working in excess of 40, they expected us to do that." (Docket #131-3 at 329.) Cozart testified he worked an average of 10-12 hours per week in overtime. (Docket #131-3 at 332.) Johnny Keel (who worked as a Salesperson and as a CSA) testified that

he worked 10-12 hours per week after 5:00 from his home during his employment. (Docket #131-3 at 306.) Jessica Casey (a Negotiator) testified she worked 10-15 hours of overtime each week during her employment. (Docket #131-3 at 297.) Plaintiff Michael Frank (Sales) testified he worked 50-60 hours in an average week (Docket #131-3 at 323.) Brian Parker (Sales) testified he worked 54-63 hours per week. (Docket #131-3 at 316.)[16]

Based on the employees' testimony and documentary evidence that management expected employees to work a "*minimum* of forty hours" (Docket #148-5 at 383), the Court finds that Plaintiffs have met their burden of establishing that certain groups of employees averaged certain numbers of overtime hours per week.

From here, the burden shifts to Defendants to "come forward with evidence of the precise amount of hours worked or with evidence to negative the reasonableness of the inference to be drawn from" Plaintiffs' evidence. *Anderson*, 328 U.S. at 687-88. Defendants cannot come forward with evidence of the precise hours worked. But they do attempt to utilize the companies' call log data to negate the reasonableness of the inference to be drawn from Plaintiffs' testimony.

Defendants' CFO, Rick Longo, contends the most accurate way of measuring actual work time for the Salespeople is to review each Salesperson's phone "talk time" gathered from ABC's call detail reports.[17] Longo calculated the time between each sales Plaintiff's first call of the day

---

[16] Plaintiffs contend in a conclusory fashion that Defendants' time sheets corroborate Plaintiffs' overtime hours worked. (Docket #153 at 15; Docket #131-3 at 485-522.) Yet Plaintiffs fail to explain how those documents confirm the overtime hours worked, if any.

[17] Plaintiffs contend three of the approximately 300 pages of call detail reports were not produced to them during discovery and should be stricken from the summary judgment record. (Docket #153 at 16.) The Court cannot locate those pages in its copy of the summary judgment record. (Docket # 134-1.) The Court's copy does not include pages 83-84 or page 176 (the pages to which Plaintiffs object). In fact, the Court's copy of Defendants' appendix is missing pages 32-288. Defendants explain through the declaration of Melanie Bixler that they had a difficult time getting non-party ADP to turn over the payroll records. Plaintiffs seek to strike her declaration because, they argue,

and the last call of the day. He concluded based on those numbers that the Salespeople Plaintiffs rarely worked 40 hours in a work week and often took extensive time off during the days. (Docket # 134-1 at 5-13.)

Whether Defendants have successfully rebutted the Salespeople Plaintiffs' evidence is a fact issue reserved for the jury. Summary Judgment is DENIED on this issue.

With respect to the CSAs and Negotiators, Plaintiffs contend Defendants' payment records do not reflect the overtime allegedly performed by Plaintiffs. (Docket #131-1 at 20; Docket #153 at 15.) They also argue Defendants' time sheets are incomplete. However, Plaintiffs maintain that the time sheets Defendant did generate confirm Plaintiffs did work overtime. (Docket # 153 at 15.)[18]

Defendants contend the CSA and Negotiator Plaintiffs' testimony is that they rarely, if ever, worked without recording their time and Defendants' records for these Plaintiffs are accurate. (Docket #143 at 22; #133 at 17; #136-2 at 791.) However, Defendants' records date back only to February 2010 and are incomplete with respect to Plaintiffs who worked prior to that time. (Docket #153 at 16.) Further, at least one Plaintiff CSA (Keel) testified he often worked from home, but was unable to clock in from home. (Docket #148-6 at 509.)

Because the there are some inconsistencies and ambiguities among the testimony of the different Plaintiffs and because there is data missing from Defendants' records, a fact issue exists on whether Plaintiffs worked overtime hours for which they were not paid. Summary Judgment is DENIED on this issue.

it is not credible in light of other testimony. The Court hereby DENIES Plaintiffs' motion to strike (Docket #162). The Court also DENIES Plaintiffs' request to file a surreply. There is ample material and evidence in the record for the Court to make well-considered ruling on all issues.

[18] Plaintiffs have not shown the Court how they interpret the time sheets. They simply direct the Court's attention to fifty or so pages of time sheet data. (Docket # 153 at 15.)

Because a fact issue remains on the issue of whether Plaintiffs worked overtime hours for which they were not compensated, the Court DENIES Plaintiffs' request for summary judgment on all damages-related issues.

### **CONCLUSION**

Plaintiffs' are entitled to summary judgment as to liability on their claims against Defendants. Fact issues remain on the issues of damages and willfulness under the FLSA. The Parties are directed to submit three proposed trial dates to the Court by February 12, 2013.

SO ORDERED, this 28th day of January 2013.

JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE